**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| LAURA JONES, | ) |
| | ) |
|       Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CITY OF SAINT LOUIS, MISSOURI, | )   Cause No. 4:19-cv-02583-AGF |
| SGT. TIMOTHY TURNER, | ) |
| OFC. JONATHAN VANARSDALE, | ) |
| OFC. BRIAN DEMATTEIS, OFC. JOSHUA | ) |
| HALL, SGT. SAMUEL GILMAN, SGT. JOE | ) |
| LANKFORD, OFC. ELIJAH SIMPSON, | ) |
| OFC. SISAVATH SINGHARATH, | ) |
| OFC. RICHARD HELLMEIER, JOHN DOE | ) |
| NO. 1, and JOHN DOE NO. 2,  in their | ) |
| individual capacities, | )   JURY TRIAL DEMANDED |
| | ) |
|       Defendants. | ) |

## AMENDED COMPLAINT

On September 15, 2017, officers with the St. Louis Metropolitan Police Department pepper sprayed Plaintiff Laura Jones ("Ms. Jones"), violently slammed her to the ground, and unconstitutionally arrested Ms. Jones without warning, without justification, and for punitive reasons. Ms. Jones was not breaking any laws; she was exercising her First Amendment rights.

## JURISDICTION AND VENUE

1.    Plaintiff brings this claim pursuant to 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, and the First and Fourth Amendments, as incorporated as against States and their municipal divisions through the Fourteenth Amendment.

2.    The jurisdiction of this Court is proper, pursuant to 28 U.S.C. § 1331, because Plaintiff's action arises under the Constitution of the United States and § 1343(a)(3) to redress the deprivation of rights secured by the Constitution of the United States.

3.      Venue is proper in the United States District Court for the Eastern District of Missouri pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in the City of St. Louis.

4.      Divisional venue is proper in the Eastern Division because a substantial part of the events leading to the claims for relief arose in the City of St. Louis and Defendants reside in the Eastern Division. E.D. Mo. L.R. 2.07(A)(1), (B)(1).

5.      This Court has supplemental jurisdiction over the included Missouri state law claims pursuant to 28 U.S.C. §1367.

6.      Plaintiff demands a trial by jury pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

7.      Defendant the City of St. Louis, Missouri (hereinafter, "City of St. Louis") is a first-class city, and a political subdivision of the State of Missouri duly organized under the Constitution of Missouri.

8.      The St. Louis Metropolitan Police Department ("SLMPD") is an instrumentality of the City of St. Louis, Missouri organized and controlled pursuant to the Statutes of the State of Missouri.

9.      The Public Facilities Protection Corporation of the City of St. Louis insures the SLMPD.

10.     Timothy Turner is employed as a police officer with the SLMPD. Defendant Turner has the rank of sergeant. Defendant Turner, acting in concert with Defendants Jonathan Vanarsdale and John Doe No. 2, made physical contact with Plaintiff and pushed Plaintiff to the ground without justification. Defendant Turner knew or should have known that there was no probable

cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff. Defendant Turner is sued in his individual capacity.

11.     Jonathan Vanarsdale is employed as a police officer with the SLMPD. Defendant Vanarsdale has the rank of officer. Defendant Vanarsdale, acting in concert with Defendants Jonathan Turner and John Doe No. 2, made physical contact with Plaintiff and pushed Plaintiff to the ground without justification. Defendant Vanarsdale knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff. Defendant Vanarsdale is sued in his individual capacity.

12.     John Doe No. 1 is an of yet unidentified officer with the SLMPD. This Defendant pepper sprayed Plaintiff. Plaintiff was unable to see the officer's nametag, as she was blinded by pepper spray and, once on the ground, curled up to protect her body. But for his own actions, these this officer could have been identified. John Doe No. 1 knew or should have known that there was no legal justification to use force on Plaintiff.

13.     John Doe No. 2 is an unidentified officer with the SLMPD. Defendant John Doe No. 2, acting in concert with Defendants Turner and Vanarsdale, made physical contact with Plaintiff and pushed Plaintiff to the ground without justification. Plaintiff was unable to see the officer's nametag, as she was blinded by pepper spray and, once on the ground, curled up to protect her body. But for his own actions, this officer could have been identified. Defendant John Doe No. 2 knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff. Defendant John Doe No. 2 is sued in his individual capacity.

14.     Brian DeMatteis is employed as a police officer with the SLMPD. Defendant DeMatteis has the rank of officer. Defendant DeMatteis stepped on Plaintiff while she lay on the

ground. Defendant DeMatteis knew or should have known that there was no legal justification to use force against Plaintiff. Defendant DeMatteis is sued in his individual capacity.

15.     Joshua Hall is employed as a police officer with the SLMPD. Defendant Hall has the rank of officer. Defendant Hall stepped on Plaintiff while she lay on the ground. Defendant Hall knew or should have known that there was no legal justification to use force against Plaintiff. Defendant Hall is sued in his individual capacity.

16.     Samuel Gilman is employed as a police officer with the SLMPD. Defendant Gilman has the rank of sergeant. Defendant Gilman seized Plaintiff and assisted with the arrest of Plaintiff. Defendant Hall knew or should have known that there was no probable cause to arrest Plaintiff. Defendant Hall is sued in his individual capacity.

17.     Joe Lankford is employed as a police officer with the SLMPD. Defendant Lankford has the rank of sergeant. Defendant Lankford seized Plaintiff and assisted with the arrest of Plaintiff. Defendant Lankford knew or should have known that there was no probable cause to arrest Plaintiff. Defendant Lankford is sued in his individual capacity.

18.     Elijah Simpson is employed as a police officer with the SLMPD. Defendant Simpson has the rank of officer. Defendant Simpson seized Plaintiff and assisted with the arrest of Plaintiff. Defendant Simpson also placed zip-tie handcuffs on Plaintiff. Defendant Simpson is also listed as the arresting officer for Plaintiff. Defendant Simpson knew or should have known that there was no probable cause to arrest Plaintiff. Defendant Simpson is sued in his individual capacity.

19.     Sisavath Singharath is employed as a police officer with the SLMPD. Defendant Singharath has the rank of officer. Defendant Singharath seized Plaintiff and assisted with the

arrest of Plaintiff. Defendant Singharath knew or should have known that there was no probable cause to arrest Plaintiff. Defendant Singharath is sued in his individual capacity.

20.     Richard Hellmeier is employed as a police officer with the SLMPD. Defendant Hellmeier has the rank of sergeant. Defendant Hellmeier seized Plaintiff and assisted with the arrest of Plaintiff. Defendant Hellmeier knew or should have known that there was no probable cause to arrest Plaintiff. Defendant Hellmeier is sued in his individual capacity.

21.     Plaintiff is a substitute teacher, and she was a resident of St. Louis County at the time of the incident giving rise to her Complaint.

## FACTS

### A.     Backdrop of Stockley Verdict

22.     On Friday, September 15, 2017, after a four-day bench trial, a Missouri Circuit Court Judge acquitted Officer Jason Stockley of the first-degree murder of Anthony Lamar Smith.

23.     This acquittal shocked many in the St. Louis community as an audio recording submitted into evidence in the trial captured Officer Stockley saying "we're killing this motherfucker, don't you know" in reference to Mr. Smith.

24.      Further, evidence showed that during the incident Officer Stockley was in possession of an assault rifle that had not been issued to him by the SLMPD.

25.     In addition, Officer Stockley claimed to find a gun in Mr. Smith's car after he killed Mr. Smith.

26.     Only Officer Stockley's DNA was found on the gun, leading many, including the Circuit Attorney of the City of St. Louis, to believe that Stockley planted the gun on Mr. Smith after Mr. Smith's death, in an effort to justify the killing.

27.     At trial, Officer Stockley's partner did not testify in Stockley's defense. Rather, the partner invoked his Fifth Amendment right against self-incrimination.[1]

### B.     Protests Begin After the Verdict

28.     Following the announcement of the Stockley Verdict, public protests began at multiple locations in St. Louis and surrounding communities.

29.     To many in the St. Louis community, Officer Stockley's acquittal was yet another example of white St. Louis-area police officers killing African-American citizens with impunity.

30.     Further, in the view of the protestors, the acquittal further supported their view that the American criminal justice system does not believe that Black lives matter.

31.     In response to the protests, St. Louis Metropolitan police officers amassed at several protests wearing military-like tactical dress, helmets, batons, and full-body riot shields and carrying chemicals, such as tear gas, skunk, inert smoke, pepper gas, pepper pellets, xylyl bromide, and/or similar substances (collectively, "chemical agents").

32.     This is in stark contrast to SLMPD's appearance at a multitude of other un-permitted protests where the police themselves are not the target of the protest, including an anti-Donald Trump march on November 13, 2016, the St. Louis Women's March on January 21, 2017, the St. Louis LGBTQIA March and Rally on February 22, 2017, and the St. Louis March for Science on April 22, 2017.

---

[1] *See* Joel Currier, *Partner of Ex-St. Louis Cop Charged with Murder is Given Immunity, Ordered to Testify*, St. Louis Post-Dispatch, Jul 27, 2016, available at http://www.stltoday.com/news/local/crime-and-courts/partner-of-ex-st-louis-cop-charged-with-murder-is/article_b85140b8-3744-55fb-83ee-3d9474cc70b3.html.

33.     During the Stockley protests, SLMPD police officers *without warning* deployed chemical agents against individuals observing, recording, or participating in protest activity, including but not limited to the following:

a.      The afternoon of Friday, September 15, 2017, near the intersection of Clark and Tucker Avenues.

b.      The evening of Friday, September 15, 2017, near the intersection of McPherson and Euclid Avenues.

c.      The evening of Friday, September 15, 2017, near the intersection of Waterman and Kingshighway Boulevards.

d.      The evening of Friday, September 15, 2017, near the intersection of Lindell and Euclid Avenues.

e.      The evening of Friday, September 15, 2017, near the intersection of Euclid and Maryland Avenues.

f.      The evening of Friday, September 15, 2017, near the intersection of Lindell and Kingshighway Boulevards.

g.      The evening of Friday, September 15, 2017, near the intersection of Euclid Avenue and Pershing Place.

h.      The evening of Friday, September 15, 2017, on Hortense Place.

i.      The evening of Sunday, September 17, 2017, near the intersection of Tucker Boulevard and Washington Avenue.

j.      The evening of September 29, 2017 outside of Busch Stadium.

34.     These incidents are consistent with the pattern and practice of SLMPD of indiscriminately using chemical agents without warning.

## C.      Post-Ferguson Federal Court Proceedings

35.      In October 2014, SLMPD fired chemical agents at protestors on South Grand.

36.      In November 2014, SLMPD officers fired chemical agents at protestors on South Grand as well as into a business where peaceful protestors had congregated. SLMPD officers refused to allow the protestors to leave.

37.      On December 11, 2014, a federal judge in this District issued a temporary restraining order enjoining the SLMPD from enforcing any rule, policy, or practice that grants law enforcement officials the authority or discretion to:

(1)      utilize tear gas, inert smoke, pepper gas, or other chemical agents (collectively, "chemical agents") for the purpose of dispersing groups of individuals who are engaged in peaceful, non-criminal activity in the City of St. Louis or in the County of St. Louis

          (a)      without first issuing clear and unambiguous warnings that such chemical agents will be utilized;
          (b)      without providing the individuals sufficient opportunity to heed the warnings and exit the area;
          (c)      without minimizing the impact of such chemical agents on individuals who are complying with lawful law enforcement commands; and
          (d)      without ensuring that there is a means of safe egress from the area that is available to the individuals; and

(2)      utilize chemical agents on individuals engaged in peaceful, non-criminal activity in the City of St. Louis or in the County of St. Louis for the purpose of frightening them or punishing them for exercising their constitutional rights.

38.      The City entered into a settlement agreement on March 25, 2015, where it agreed as follows:

A.      Defendants and their agents, servants, employees, and representatives, will not enforce any rule, policy, or practice that grants law enforcement officials the authority or discretion to:
          (1)      utilize tear gas, inert smoke, pepper gas, or other chemical agents (collectively, "chemical agents") for the purpose of dispersing groups of individuals who are engaged in non-criminal activity:

(a)     without first issuing clear and unambiguous warnings that such chemical agents will be utilized;

(b)     without providing the individuals sufficient opportunity to heed the warnings and exit the area;

(c)     without reasonably attempting to minimize the impact of such chemical agents on individuals who are complying with lawful law enforcement commands; and

(d)     without ensuring that there is a means of safe egress from the area that is available to the individuals and announcing this means of egress to the group of individuals.

(2)     utilize chemical agents on individuals engaged in non-criminal activity for the purpose of frightening them or punishing them for exercising their constitutional rights.

B.     Provided, however, that Paragraph A hereof shall not be applicable to situations that turn violent and persons at the scene present an imminent threat of bodily harm to persons or damage to property, and when law enforcement officials must defend themselves or other persons or property against such imminent threat.

### D.     SLMPD Violations of the Consent Decree

39.     Less than two months after entering into this Consent Decree, SLMPD began to violate the Decree.

40.     On May 19, 2015, in response to protests over the St. Louis Circuit Attorney's office's refusal to charge another SLMPD officer for killing another African-American man, SLMPD officers deployed chemical agents against peaceful, non-criminal protestors without warning.

41.     On August 19, 2015, a protest occurred because SLMPD officers killed another African-American man in the Fountain Park neighborhood. According to the testimony of Sarah Molina, a local attorney, SLMPD officers indiscriminately used chemical agents without giving an audible and intelligible warning at the intersection of Walton Avenue and Page Boulevard. Molina testified that SLMPD officers fired chemical agents at her without giving her an opportunity to leave. SLMPD officers continued using chemical agents against people fleeing the

area and even fired chemical agents at people peacefully standing on or in their own properties. Thirty minutes after the protests had dissipated, SLMPD officers returned and fired chemical agents at Ms. Molina, who was standing on property that she owns.

42.     On July 21, 2017, SLMPD officers used chemical agents against people protesting the treatment of detainees in the St. Louis City Workhouse. Although a few people did engage in unlawful activity earlier in the night, SLMPD officers pepper sprayed numerous people, none of whom were involved in criminal activity or were even at the same location as the criminal activity. These protesters were engaged in non-violent protesting when SLMPD officers sprayed them with chemical agents.

43.     Defendants' action in the instant matter follows the same script whereby SLMPD officers violate the Constitutional rights of people expressing their First Amendment right to protest against the police. Defendants' pattern and practice of illegally arresting and using chemical munitions against peaceful citizens is not only well-documented, but is detailed in *Ahmad* and *Templeton. See* Doc. 58 at 10, Memorandum and Order of Preliminary Injunction, *Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D. Mo. Nov. 15, 2017); *see also* Temporary Restraining Order, *Templeton v. Dotson*, 2015 WL 13650910, No. 4:14-cv-02019 at *3 (E.D. Mo. Dec. 11, 2014).

**E.      The September 15, 2017 Protest**

44.     This pattern and practice of utilizing chemical agents on individuals engaged in peaceful, non-criminal activity continued on September 15, 2017.

45.     On September 15, 2017, Ms. Jones heard about the Stockley verdict while on her way to the St. Louis Bread Co. on Brentwood Boulevard.

46.     At about 4:00 pm, at St. Louis Bread Co., she chatted with an elderly stranger and his granddaughter. The three of them discussed the inadequacy of the verdict, and Ms. Jones felt inspired to attend the protest she heard was underway downtown.

47.     Ms. Jones drove downtown and asked a police officer where the protest was taking place. The officer was not from the area, so he did not know where to direct her.

48.     Eventually, Ms. Jones found a place to park and encountered a young couple with whom she headed towards the site of the protest.

49.     Ms. Jones listened to a clergyman speak about social justice and talked to a few people in the crowd.

50.     After a while, Ms. Jones looked around and noticed a substantial police presence. She feared that the police would hurt, or even kill, someone.

51.     Ms. Jones heard the police saying something over a loudspeaker, but she could not make out the words. The speech was fast and garbled, like a bus station announcement.

52.     The environment grew chaotic. People were yelling, the police continued the unintelligible announcements, and a few people started throwing rocks.

53.     Protesters yelled for calm, as the protest was peaceful.

54.     As Ms. Jones turned her head to try to make out what the officers were saying, she made eye contact with an officer, John Doe No. 1.

55.     John Doe No. 1 looked at Ms. Jones with abject disgust before spraying her with pepper spray.

56.     Ms. Jones had done nothing wrong. She had committed no crimes. She had not harmed officers or anyone else.

11

57.     Yet, she was pepper sprayed, leaving her crying out as her eyes burned more than she had ever thought possible. She could not see.

58.     Right after, Ms. Jones thought she had been plowed by a truck. Instead, Defendants Turner, Vanarsdale, and John Doe No. 2 rammed her with their bodies and shields, throwing her to the ground.[2]

59.     Ms. Jones curled herself into a fetal position. Blinded by the pepper spray and feeling officers' feet strike her again and again, Ms. Jones feared that officers would break her ribs or crush her skull. She thought she was going to die.

60.     Defendants De Matteis and Hall callously kicked Ms. Jones's body as they walked over her.

61.     Their fellow officers walked over and around Ms. Jones without offering her any assistance.

62.     Ms. Jones has conducted extensive discovery to identify the John Doe defendants, including but not limited to, providing the City with multiple videos and pictures of John Doe No. 2 abusing Ms. Jones and identifying multiple officers who were standing next to and John Doe No. 2, who should have been able to identify and John Doe No. 2. Sadly, this was not unexpected. The documentation of the mass arrest was extraordinarily mismanaged. Minimal effort was made throughout the weekend to document and identify the use of force against Plaintiff and other citizens. On numerous occasions, unreported unlawful uses of force were captured on video, and the City did not attempt to correct the documentation, much less investigate and punish them for their unlawful acts.

---

[2] *See* FOX2now, *Watch the lady wearing red in the bottom right of the screen.  Police using pepper spray on protesters marching after the Stockley ruling*, Twitter, Sep 15, 2017 available at *https://twitter.com/FOX2now/status/908818921079291905*

63.     SLMPD officers also have been intentionally hiding behind the anonymity of their civil disobedience team uniforms. In fact, SLMPD officers who beat an undercover officer during these same protests bragged that they could use their anonymity to inflict constitutional violations without ramifications. *See* Doc. 2, Redacted Indictment, *United States v. Boone, et. al*, No. 4:18-cr-00975 at *3 (E.D. Mo. Dec. 11, 2014). These tactics were used as far back as 2014 during the protests that resulted from Michael Brown's death. Rather than causing its officers to cease with this tactic, the City ratified this behavior by failing to investigate, failing to document, failing to holding officers accountable, and failing to train officers to not hide their identities.

64.     Even though the officers had no probable cause to arrest Ms. Jones, the officers had every opportunity to seize her without pushing her down and then trampling on her.

65.     The CDT training supposedly includes very detailed instruction on how to accomplish this. The officers ignored this training and mercilessly inflicted pain on Plaintiff. The City ratified their behavior by failing to document their misdeeds, the identities of the officers, and failing to conduct any investigation into their unlawful activities.

66.     Defendants Gillman and Lankford violently yanked Ms. Jones from the ground. Defendant Simpson grabbed her arms roughly, and handcuffed her tight enough to leave bruises.

67.     An officer told Ms. Jones that she was in the middle of something she did not understand, that she did not know what she was doing. He then took her to a police vehicle.

68.     Suffering from the effects of the pepper spray and trauma, Ms. Jones began to have an asthma attack.

69.     Although he was not a medical professional, the officer refused to give Ms. Jones her inhaler. Inexplicably, the officer made numerous unsuccessful attempts to administer Ms. Jones's inhaler himself.

70.     Reeling from the burning in her eyes, the aches from being knocked down, and the chest soreness caused by her asthma attack, Ms. Jones again feared that she might die.

71.     Ms. Jones suffered for over two hours while she and about four other arestees waited to be transported. Defendants Singharath and Hellmeir had custody of Ms. Jones before she was transported from the scene.

72.     Police took Ms. Jones and the other arrestees to a building with which Ms. Jones was not familiar, and she still could not see.

73.     There, officers badgered and mocked Ms. Jones as she attempted to cope and fill out forms. Worse, an officer ignored Ms. Jones's complaint that she could not see, refused to assist her, and allowed her to bump into walls twice.

74.     Ms. Jones was directed into a cold cell containing a filthy toilet with no toilet paper, no soap, and no access to drinking water. Ms. Jones and the other arestees were given nothing to eat.

75.     Ms. Jones was unable to sleep, as her back ached from the officers' abuse.

76.     Ms. Jones asked an officer how long she would be held; he said some people were detained for three weeks. Ms. Jones was terrified that she was being left to rot.

77.     Eventually, a female officer expressed surprise that Ms. Jones and the others had not been released. The officer said she would check on their status.

78.     Ms. Jones was in the cell from about 7:30 pm to 1:00 am.

79.     Officers took her and the other women to a police van and transported them to the St. Louis City Justice Center.

80.     There, a nurse took Ms. Jones's medical history, and the nurse told Ms. Jones that she would get Ms. Jones's blood pressure medication.

14

81.     Ms. Jones and the others were also given one stale, leftover muffin each.

82.     Some of the other arestees started to get released. Ms. Jones was not allowed to access her cellphone, she did not have any numbers memorized, and she only had $3.00 in her purse. Ms. Jones was horrified that she could not pay bail.

83.     Officers took her to a small cell with what looked like feces smeared on the walls. They served her breakfast under the door.

84.     At 11:00 am, Ms. Jones again inquired about when she would be released. Finally, the officers released her at 12:00 pm.

85.     Ms. Jones left with her legs and ankles horribly swollen, as she was never given her blood pressure medication.

86.     Without probable cause, the City of St. Louis charged Ms. Jones with interfering with an officer. Ultimately, the charge was dismissed, but Ms. Jones's troubles did not end there.

87.     Ms. Jones was in treatment for complex post-traumatice stress disorder, anxiety, and depression before September 15, 2017. Following her assault, unlawful arrest, and inhumane confinement, Ms. Jones's mental health deteriorated considerably.

88.     For the first month following the protest, Ms. Jones had nightmares, and she was unable to concentrate. She stayed in her apartment, too afraid to venture out.

89.     In October 2017, Ms. Jones was substitute teaching. Upon reviewing a lesson plan on To Kill a Mockingbird, Ms. Jones had a panic attack. Her knees felt like jelly, her breathing quickened, and her chest tightened.

90.     Later, while watching the movie's jail scene, Ms. Jones had another panic attack. All of the sudden, she imagined herself back in police custody. Her hands shook violently, and she

spilled her coffee all over the primary teacher's documents and the floor. She screamed an expletive. As a result, she was fired from her position.

91.     As her mental health continued to deteriorate, Ms. Jones was unable to apply for new jobs. In April 2018, she decided to get a fresh start by moving to Michigan. That did not help. Even in Michigan, she just stayed in her apartment for months.

92.     By September 2018, Ms. Jones had started feeling a little better. She started applying for substitute teaching positions. A potential employer told Ms. Jones she was a shoe-in. All she had to do was pass the background check. She never heard from that employer again.

93.     In October 2018, another employer gave Ms. Jones employment, pending a background check. The employer urged Ms. Jones to get a statement of resolution from the City of St. Louis concerning her September 15, 2017 arrest.

94.     After months of run-around from the City of St. Louis, requiring Ms. Jones to fly back to St. Louis in December 2018, Ms. Jones obtained the documentation she needed. Ms. Jones was finally able to start working again in January 2019.

95.     Still, the trauma Ms. Jones suffered at the hands of the SLMPD continues to haunt her. Ms. Jones fears risking termination by working in a more stressful setting, like high school. This limits the number of days Ms. Jones can work.

96.     Yet, even avoiding high school assignments is not enough. Ms. Jones had a panic attack in an elementary class while reading a book about college students protesting lunch counter segregation in the 1960s.

97.     Ms. Jones also has panic attackes when she sees police. She is haunted by the look of hatred in the eyes of the SLMPD officer who pepper sprayed her.

## F.      Federal Court Injunctive Relief

98.     On November 15, 2017, a judge in this District barred SLMPD from using many of the tactics described in this complaint.

99.     The Court found that "[p]rotest activity began shortly after the announcement of the verdict on the morning of September 15, 2017. Protesters assembled in front of the state courthouse downtown near Tucker and Market streets. They did not have a permit to protest because the City of St. Louis does not require, and will not provide, a permit for protests."

100.     In an attempt to defend the SLMPD's actions, the City's attorney "stated during closing arguments that 'the police have the right to tell people, at this point, we're done for the evening; there's no – no more assembling; this assembly is over.'"  Not surprisingly, the Court did not adopt this rationale as a basis for the arrests and the use of chemical agents.

101.     The Court made the following findings:

a.      Plaintiffs are likely to prevail on the merits of their claims that the policies or customs of defendant discussed below violate the constitutional rights of plaintiffs.

b.      Plaintiffs have presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant's custom or policy is to permit any officer to declare an unlawful assembly in the absence of the force or violence requirement of St. Louis City Ordinance 17.16.275 and Mo. Rev. Stat. § 574.060, in violation of plaintiffs' First and Fourth Amendment rights.

c.      Plaintiffs have presented sufficient evidence for purposes of awarding preliminary injunctive relief that defendant's custom or policy of committing discretionary authority to police officers to declare unlawful assemblies in the absence of any threat of force or violent activity provides no notice to citizens of what conduct is unlawful, and it

permits officers to arbitrarily declare "there's no more assembling." Plaintiffs have presented sufficient evidence at this stage of the proceedings that this discretion was in fact exercised in such a manner in violation of plaintiffs' constitutional rights.

d.      Similarly, Plaintiffs have presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant's custom or policy is to permit officers to issue vague dispersal orders to protesters exercising their first amendment rights in an arbitrary and retaliatory way and then to enforce those dispersal orders without sufficient notice and opportunity to comply before being subjected to uses of force or arrest, in violation of Plaintiffs' First and Fourth Amendment rights.

e.      Plaintiffs presented sufficient, credible evidence for purposes of awarding preliminary injunctive relief that defendant has a custom or policy, in the absence of exigent circumstances, of issuing dispersal orders to citizens engaged in expressive activity critical of police which are either too remote in time and/or too vaguely worded to provide citizens with sufficient notice and a reasonable opportunity to comply, inaudible and/or not repeated with sufficient frequency and/or by a sufficient number of officers to provide citizens with sufficient notice and a reasonable opportunity to comply, contradictory and inconsistent, not uniformly enforced, and retaliatory.

f.      Plaintiffs have also presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant has a custom or policy of using chemical agents without warning on citizens engaged in expressive activity that is critical of police or who are recording police in retaliation for the exercise of their first amendment rights, in violation of the First, Fourth, and Fourteenth Amendments.

g.    The City's custom or policy of authorizing the use of hand-held mace against non-violent protesters with no warning or opportunity to comply and in the absence of probable cause or exigent circumstances impermissibly circumvents the protections afforded by the *Templeton* settlement agreement and vests individual officers with unfettered discretion to exercise that authority in an arbitrary and retaliatory manner in violation of constitutional rights.

h.    Plaintiffs' evidence — both video and testimony — shows that officers have exercised their discretion in an arbitrary and retaliatory fashion to punish protesters for voicing criticism of police or recording police conduct. When all of the evidence is considered, plaintiffs have met their burden of showing that they are likely to succeed on their claim that defendant has a custom or policy of deploying hand held pepper spray against citizens engaged in recording police or in expressive activity critical of police in retaliation for the exercise of their first amendment rights, in violation of the First, Fourth, and Fourteenth Amendments.

i.    Plaintiffs have also presented sufficient evidence at this preliminary stage of the proceedings that the aforementioned customs or policies of defendant caused the violations of plaintiff's constitutional rights. That is because "it is well-settled law that a loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" and "it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 691 (8th Cir. 2008) (internal quotation marks and citations omitted), overruled on other grounds, *Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678 (2012). *Id*. 44-45.

102.     On information and belief, senior officials of the SLMPD directed such actions and conduct and/or tacitly accepted and encouraged such conduct by not preventing officers from engaging in such conduct and by not disciplining them when they did engage in such actions and conduct.

## COUNT I
### 42 U.S.C. § 1983 – First and Fourteenth Amendment Violations
### (Against All Individual Defendants)

103.     Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

104.     Plaintiff has a fundamental right to assemble and express Plaintiff's views protected by the freedom of association and freedom of speech clauses of the First Amendment, as applied to the states under the Fourteenth Amendment to the United States Constitution.

105.     Defendants' actions violated Plaintiff's rights under the First Amendment to freedom of speech and freedom of assembly by interfering with Plaintiff's ability to associate freely in public and express Plaintiff's views as part of a peaceful demonstration.

106.     Observing and recording public protests, and the police response to those protests, is also a legitimate means of gathering information for public dissemination that is protected by the freedom of speech and freedom of the press clauses of the First Amendment, as applied to the states under the Fourteenth Amendment to the United States Constitution.

107.     Defendants' actions violated Plaintiff's First Amendment rights to freedom of speech and freedom of assembly by interfering with Plaintiff's ability to associate freely in public and express Plaintiff's views as part of a peaceful demonstration.

108.     Defendants engaged in these unlawful actions willfully and knowingly, acting with reckless or deliberate indifference to Plaintiff's First Amendment rights.

109.     As a direct and proximate result of Defendants' unlawful actions described herein, Plaintiff suffered damages including: physical injury, emotional trauma, great concern for Plaintiff's own safety; fear, apprehension, depression, anxiety, consternation and emotional distress;

110.     Additionally, Defendants' actions described herein have had a chilling effect on Plaintiff, who is now less likely to participate in free public discourse.

111.     At all times, Defendants were acting under color of state law.

112.     If Plaintiff prevails, Plaintiff is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

**COUNT II**
**42 U.S.C. § 1983 – Municipal Liability**
***Monell* Claim against Defendant City of St. Louis for Failure to Train, Failure to Supervise, and for a Custom of Conducting Unreasonable Search and Seizures and Use of Excessive Force**

113.     Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

114.     Defendant City is liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the remaining Defendants' violations of Plaintiff's rights because the violations were caused by a policy, practice, or custom of the St. Louis Metropolitan Police Department. Among the SLMPD policies, practices, or customs that caused constitutional harm to Plaintiff are the following:

a.     SLMPD officers' routine use of excessive force when policing protests, especially those at which police brutality is being protested;

b.     SLMPD's policy or custom of issuing vague and even contradictory dispersal orders without giving an opportunity to comply;

c.      SLMPD's policy of arbitrarily declaring unlawful assemblies in the absence of any threat or force or violent activity that provides no notice to citizens or unlawful conduct;

d.      SLMPD has a custom, policy, or practice of violating the Fourth Amendment by regularly conducting unreasonable seizures and arresting individuals without probable cause.

e.      SLMPD has a custom, policy, or practice of allowing its officers to violate the constitutional rights of citizens while hiding their identities to avoid suits such as this.

115.    Defendant City had notice that its use of force training and officer supervision was inadequate and likely to result in constitutional violations based on multiple incidents of excessive force against protestors in October 2014, November 2014, July 2015, August 2015, and September 2017.

116.    Despite Defendant City's March 2015 *Templeton* settlement agreement, SLMPD officers continue to use chemical munitions against non-violent citizens, illustrating Defendant City's deliberate and conscious choice to maintain training and supervision practices that give rise to constitutional violations.

117.    Even after the *Templeton* settlement and the incidents that gave rise to it, Defendant City did not initiate or require comprehensive retraining of its officers, despite repeated, similar constitutional violations perpetrated by SLMPD officers after that settlement and before the incident at issue in this case.

118.    Throughout the protests in September 2017, Defendant City failed to properly document the police response to the protest and failed to follow its own policies procedures regarding such documentation. These failures, along with the intentional decision to allow its

22

officers to violate the constitutional rights of citizens while hiding their identities, has resulted in two John Doe officers not yet being identified.

119.    The CDT training supposedly includes very detailed instruction on how to arrest a subject during a protest. The officers ignored this training and mercilessly inflicted pain on Plaintiff. The City ratified their behavior by failing to document their misdeeds, the identities of the officers, and failing to conduct any investigation into their unlawful activities.

120.    Defendant City should not be rewarded for this malfeasance and should be held liable under *Monell* for their actions and also directly liable for the John Doe officers' malfeasance.

121.    In its failures, Defendant City has been deliberately indifferent to the rights of citizens, and these failures, policies, and customs are the moving force behind, and direct and proximate cause of, the constitutional violations suffered by Plaintiff as alleged herein.

122.    As a direct result of the Defendant City's failures, policies, and customs as described herein, Plaintiff suffered damages, including physical injury, fear, apprehension, and concern for Plaintiff's own safety.

123.    If Plaintiff prevails, Plaintiff is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

### COUNT III
**Missouri State Law – Negligent Infliction of Emotional Distress**
**(Against All Defendants)**

124.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

125.    By assaulting Plaintiff and arresting Plaintiff without probable cause, Defendants realized or should have realized that their conduct posed an unreasonable risk to Plaintiff.

126.     Further, Plaintiff was reasonably in fear for Plaintiff's own person because of the actions of Defendants and suffered emotional distress or mental injury that is medically diagnosable and sufficiently severe to be medically significant as a result of Defendants' actions.

127.     Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

128.     Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters."

129.     By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

130.     The actions of Defendants, as described above, were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

## COUNT IV
### 42 U.S.C. § 1983 – Fourth and Fourteenth Amendment: Excessive Force
**(Against Defendants John Doe No. 1, Turner, Vanarsdale, John Doe No. 2, DeMatteis, Hall, and Simpson)**

131.     Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

132.     Defendant John Doe No. 1 pepper sprayed Plaintiff without justificiation.

133.    Defendants Turner, Vanarsdale, and John Doe No. 2, acting in concert, pushed Plaintiff down on the ground without warning or justification.

134.    As Plaintiff lay on the ground helpless, Defendants DeMatteis and Hall stepped on and kicked Plaintiff.

135.    Defendant Simpson forcefully handcuffed Plaintiff tight enough to leave bruises.

136.    Defendants' use of force against Plaintiff was objectively unreasonable and constituted excessive force.

137.    Defendants engaged in these actions willfully and knowingly, acting with reckless or deliberate indifference to the Plaintiff's Fourth Amendment rights. As a direct and proximate result of Defendants' unlawful actions, Plaintiff was damaged.

138.    As a direct result of the conduct of Defendants described herein, Plaintiff suffered physical injury and emotional trauma.

139.    At all times, Defendants were acting under color of state law.

140.    If Plaintiff prevails, Plaintiff is entitled to recover attorneys' fees, pursuant to 42 U.S.C. § 1988.

**COUNT V**
**Missouri State Law – Battery**
**(Against Defendants John Doe No. 1, Turner, Vanarsdale,**
**John Doe No. 2, DeMatteis, Hall, Simpson, and the City of St. Louis)**

141.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

142.    During the process of being unconstitutionally struck, pepper sprayed, and arrested, Plaintiff suffered battery at the hands of Defendants.

143.    Defendant John Doe No. 1 pepper sprayed Plaintiff without justificiation.

144.     Defendants Turner, Vanarsdale, and John Doe No. 2, acting in concert, pushed Plaintiff down on the ground without warning or justification.

145.     As Plaintiff lay on the ground helpless, Defendants DeMatteis and Hall stepped on and kicked Plaintiff.

146.     Defendant Simpson forcefully handcuffed Plaintiff tight enough to leave bruises.

147.     In striking and pepper spraying Plaintiff, Defendants caused further intentional and offensive bodily contact.

148.     Namely, Defendants' physically aggressive tactics caused intentional and offensive bodily harm to Plaintiff.

149.     As a direct result of Defendant's conduct described herein, Plaintiff suffered damages, including physical injury, emotional trauma, great concern for Plaintiff's own safety; fear, apprehension, depression, anxiety, consternation and emotional distress.

150.     Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

151.     Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters."

152.     By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

153.    The actions of Defendants, as described above, were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

**COUNT VI**
**42 U.S.C. § 1983 – Fourth and Fourteenth Amendment Violations: Unreasonable Seizure**
**(Against All Defendants except the City of St. Louis)**

154.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

155.    Defendants did not have probable cause to arrest Plaintiff.

156.    Defendant John Doe No. 2 pepper sprayed Plaintiff without justificiation.

157.    Defendants Turner, Vanarsdale, and John Doe No. 2, acting in concert, pushed Plaintiff down on the ground without warning or justification.

158.    As Plaintiff lay on the ground helpless, Defendants DeMatteis and Hall stepped on and kicked Plaintiff.

159.    Defendants Gilman, Lankford, Simpson, Singharath, and Hellmeier, at different times, each unlawfully seized Plaintiff and assisted with her arrest.

160.    Defendant Simpson also forcefully handcuffed Plaintiff tight enough to leave bruises. He is named as the arresting officer.

161.    Defendants unreasonably seized Plaintiff, thereby depriving Plaintiff of Plaintiff's right to be free from unreasonable seizure of Plaintiff's person in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

162.     Further, there was no objectively reasonable belief that Plaintiff had committed a criminal offense, nor was there even arguable probable cause for the arrest. As such, the seizure was unreasonable.

163.     Defendants engaged in these unlawful actions willfully and knowingly, acting with reckless or deliberate indifference to Plaintiff's Fourth Amendment rights. As a direct and proximate result of Defendants' unlawful actions, Plaintiff was damaged.

164.     At all times, Defendants were acting under color of state law.

165.     If Plaintiff prevails, Plaintiff is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

**COUNT VII**
**Missouri State Law – False Arrest**
**(Against All Defendants)**

166.     Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

167.     Plaintiff was arrested without any legal justification or probable cause by Defendants.

168.     Defendants proceeded to constrain and confine Plaintiff against Plaintiff's free will. There was no lawful justification for Defendants restraining and confining Plaintiff in the above manner.

169.     As a direct result of the conduct of Defendants described herein, Plaintiff suffered damages, including physical injury, fear, apprehension, and emotional trauma.

170.     Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

171.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters."

172.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

173.    The actions of Defendants, as described above, were carried out in bad faith and with malice, such that punitive damages should be awarded to punish Defendants and to deter them, as well as others similarly-situated individuals from engaging in similar conduct in the future, in an amount to be determined by a jury.

## COUNT VIII
### Missouri State Law – False Imprisonment
### (Against All Defendants)

174.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

175.    Defendants intentionally restrained and confined Plaintiff against Plaintiff's will when they took Plaintiff into custody and detained Plaintiff.

176.    Plaintiff did not consent to Defendants' actions in removing and confining Plaintiff in the manner described above, nor in any manner whatsoever.

177.    There was no lawful justification for Defendants to restrain and confine Plaintiff in the manner described above.

178.    Defendants held Plaintiff in confinement for a substantial period of time, spanning several hours.

179.     As a direct and proximate result of Plaintiff's false imprisonment by Defendants, Plaintiff suffered damages, including physical injury, emotional trauma, great concern for Plaintiff's own safety; fear, apprehension, depression, anxiety, consternation and emotional distress.

180.     Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

181.     Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters."

182.     By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

183.     Defendants' actions, as described above, were carried out with an evil motive and/or reckless indifference and conscious disregard for Plaintiff's rights, thereby entitling Plaintiff to punitive damages in an amount sufficient to punish and deter Defendants and others similarly situated from like conduct in the future.

## COUNT IX
### Missouri State Law – Abuse of Process
### (Against All Defendants)

184.     Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

185.    Defendants made an illegal, improper, and perverse use of process by arresting, charging, and detaining Plaintiff without any legal justification or probable cause in order to harass and intimidate Plaintiff, which constitutes an improper collateral purpose.

186.    Defendants acted willfully and knowingly when they abused legal process for unlawful purposes and with an illegitimate collateral objective, in that Defendants used legal process through their authority for purposes other than the legitimate investigation and prosecution of criminal acts.

187.    As a direct and proximate result of Defendants' abuse of process, Plaintiff suffered damages including: emotional trauma, great concern for Plaintiff's own safety; fear, apprehension, depression, anxiety, consternation and emotional distress; lost time; loss of employment opportunity; and loss of faith in society.

188.    Defendants' actions, as described above, were carried out with an evil motive and/or reckless indifference and conscious disregard for Plaintiff's rights, thereby entitling Plaintiff to punitive damages in an amount sufficient to punish and deter Defendants and others similarly situated from like conduct in the future.

## COUNT X
### Missouri State Law – Malicious Prosecution
### (Against All Defendants)

189.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

190.    Defendants assisted in the filing of charges against Plaintiff with no probable cause that Plaintiff had committed a crime or ordinance violation.

191.    Such charges were subsequently dismissed against Plaintiff. As a direct result of the conduct of Defendants described herein, Plaintiff suffered damages, including physical injury,

emotional trauma, great concern for Plaintiff's own safety; fear, apprehension, depression, anxiety, consternation and emotional distress; lost time; loss of employment opportunity; and loss of faith in society.

192.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

193.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters."

194.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

195.    The actions of Defendants, as described above, were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

**WHEREFORE**, Plaintiff prays for judgment in favor of Plaintiff, against all Defendants, for compensatory damages, punitive damages, attorneys' fees, expenses, costs, and for any other relief this Court deems just and appropriate.

Date: December 14, 2020                    Respectfully Submitted,

                                           **KHAZAELI WYRSCH LLC**

                                           /s/ James R. Wyrsch
                                           James R. Wyrsch, 53197MO
                                           Javad M. Khazaeli, 53735MO
                                           Kiara N. Drake, <u>67129MO</u>
                                           <u>911</u> Washington Avenue, Suite 211
                                           St. Louis, MO 63101
                                           (314) 288-0777
                                           (314) 400-7701 (fax)
                                           james.wyrsch@kwlawstl.com
                                           javad.khazaeli@kwlawstl.com
                                           kiara.drake@kwlawstl.com