**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LAURA JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 4:19-cv-02583-AGF |
| | ) | |
| CITY OF SAINT LOUIS, MISSOURI, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT**
**OF UNCONTROVERTED MATERIAL FACTS**

**Overview of Protest the Afternoon of September 15, 2017**

1.      On September 15, 2017, the verdict in the criminal case of the *State of Missouri v. Jason Stockley* was released. (Doc. 39, ¶ 22).

   **Response: Uncontroverted.**

2.      In response to the verdict, many people began to protest in downtown St. Louis that day. (Exhibit Q, 9/15 Afternoon Video).

   **Response: Uncontroverted.**

3.      Plaintiff Laura Jones ("Jones") arrived in downtown St. Louis in the late afternoon to join the protests. (Ex. A, Laura Jones Deposition, 48:13-15).

   **Response: Uncontroverted.**

4.      Early in the afternoon, officers from the St. Louis Metropolitan Police Department ("SLMPD") were being loaded on to several buses in an effort to leave the area. (Ex. B, Rossomanno Preliminary Injunction Testimony, 149:8-150:2).

**Response: Uncontroverted. However, this occurred at approximately 1:30 pm which was almost four hours before the incident involving Plaintiff.** *See* **Exh. 1, Real Time Crime Center ("RTCC") video at; Exh. 2, Police Report at CITY 000433.**

5.     SLMPD hoped that moving the SLMPD out of the area would prevent the protest from escalating. (Ex. B, Rossomanno Testimony, 148:17-149:16).

**Response: Controverted as it is impossible to confirm or deny what an inanimate entity such as a police department supposedly "hopes."**

6.     However, after Civil Disobedience Teams ("CDT") loaded the buses, protestors began to surround the buses, preventing them from leaving. (Ex. B, Rossomanno Testimony, 149:19-150:11; Ex. Q at 12:45-13:11, 15:00-15:50).

**Response: Uncontroverted. However, this occurred at approximately 1:30 pm which was almost four hours before the incident involving Plaintiff.** *See* **Exh. 1, Real Time Crime Center ("RTCC") video at; Exh. 2, Police Report at CITY 000433.**

7.     These actions by the protestors prevented two of the buses from being able to leave. (Ex. B, Rossomanno Testimony, 151: 6-7; Ex. Q at 12:45-13:11, 15:00-15:50).

**Response: Controverted. The video evidence shows that there was a path for the buses to leave as they were only blocked at the front. Nonetheless, this occurred at approximately 1:30 pm which was almost four hours before the incident involving Plaintiff.** *See* **Exh. 1, Real Time Crime Center ("RTCC") video at; Exh. 2, Police Report at CITY 000433.**

8.     As the protestors had surrounded the buses, other people in the crowd were throwing items at the buses. (Ex. B, 150:3-151:6; Ex. Q at 16:10-17:01).

**Response: Controverted. At the video timestamps identified by Defendants above, it appears that a few protestors threw what appear to be empty water bottles at the buses,**

**which bounced harmlessly off the buses. There is no allegation that Ms. Jones was involved in this incident with the busses, which occurred hours before her arrival and the incident at issue.** *See* **Def. Exh. A, Jones Dep. 41:8-18.**

9.      There were also protestors that were locked arm-in-arm in an attempt to prevent the bus from moving away from the area. (Exhibit J, Documentation team video Bates Stamped CITY 000058 at 0:58; Ex. Q at 17:14-17:30).

      **Response: Uncontroverted. However, there is no allegation that Ms. Jones was involved in this incident with the busses, which occurred hours before her arrival and the incident at issue.** *See* **Def. Exh. A, Jones Dep. 41:8-18.**

10.      At least one of those items was hard enough to break a window of one of the buses. (Ex. C, Deposition of Gregory Schaffer, 45:17-46:3).

      **Response: Controverted. Defendants have offered no evidence to corroborate this allegation. Moreover, the police report contradicts this allegation, as it only references throwing of water bottles and small rocks and makes no reference to a window being broken or anyone being arrested for breaking a bus window.** *See* **Plaintiff's Ex. 40 at CITY 000433. Regardless, there is no allegation that Ms. Jones was involved in this incident with the busses, which occurred hours before her arrival and the incident at issue.** *See* **Def. Exh. A, Jones Dep. 41:8-18.**

11.      In addition, officers had items thrown at them by protestors. (Ex. F, Deposition of Samuel Gilman Deposition, 70:1-11; Ex. O, Lankford Depo., 27:20-28:13; Ex. BB, 9/15 Injury Reports).

      **Response: Controverted to the extent that Defendants are attempting to tie these uncorroborated claims with their assault on Ms. Jones. With regard to Gilman, the incident**

**with the bottle occurred at 2:00 pm, hours before the incident at issue in this case.** *See* **Exh. 2 at CITY 000435; Def. Exh. F Gilman Dep. 76:2-8. With regard to Lankford, neither the police report nor the injury report mentions anything being thrown at Lankford.** *See* **Exh. 2; Def. Exh. BB. Additionally, of the injuries listed in the report, only one occurred near the time of the incident with Ms. Jones.** *See* **Def. Exh. BB at 1. There is no allegation that Ms. Jones was involved in this bottle throwing incident, which occurred hours before her arrival and the incident at issue.** *See* **Def. Exh. A, Jones Dep. 41:8-18.**

12.     Protestors were also spitting on officers. (Ex. F, Gilman Depo., 70:1-11; 71:15-16).

        **Response: Controverted. Defendants are falsely painting a picture that numerous protestors were spitting on officers. The evidence does not support that assertion. Sgt. Gilman testified that he and Officer Lemon were spit on while they were attempting to arrest one person involved in the bottle throwing incident described in Statement of Fact 11.** *See* **Exh. 2 at CITY 000435; Def. Exh. F Gilman Dep. 69:1-11; 71:13-15; 73:12-14. This occurred hours before the incident involving Ms. Jones.** *See* **Exh. 2 at CITY 000435; Def. Exh. F Gilman Dep. 76:2-8. There is no allegation that Ms. Jones was involved in any spitting incident, which occurred hours before her arrival and the incident at issue.** *See* **Def. Exh. A, Jones Dep. 41:8-18.**

13.     SLMPD had to call in the Bicycle Response Team (BRT) to help extract the buses. (Ex. B, Rossomanno Testimony, 151:8-14; Ex. Q at 18:30-20:12).

        **Response: Uncontroverted. Regardless, there is no allegation that Ms. Jones was involved in this incident with the busses, which occurred hours before her arrival and the incident at issue.** *See* **Def. Exh. A, Jones Dep. 41:8-18.**

14.     The BRT team members had to engage a number of protestors that were locked arm-in-arm, in their attempts to keep the bike officers from moving freely. (Ex. D, Deposition of Scott Boyher (Dec. 8, 2020), 131:20-132:7; Exhibit E, Deposition of Michael Marks, 21:18-22:13; Ex. Q at 18:30-20:12; 22:07-22:43).

**Response: Controverted in part. The video evidence shows that the officers formed a wedge that quickly disrupted the women holding their arms in front of the bus without incident.** *See* **Exh. 1, starting at the 1:30:00 mark. The video does not show the BRT team members needing to "engage a number of protestors" other than to quickly move them out of the way.** *Id.*

15.     Shortly after the buses left the area, a couple of individuals jumped on and kicked in the windshield of a vacant police vehicle that was parked on Clark Street, just west of the intersection with Tucker. (Ex. B, Rossomanno Testimony, 153:9-24; Ex. Q at 28:33-28:50).

**Response: Controverted to the extent that this did not occur "[s]hortly after the busses left the area," but instead apparently happened more than three hours later.** *See* **Exh. 2 at CITY 000436.**

16.     SLMPD responded by sending officers to the vehicle to try and extract it from those who were damaging it. (Ex. B, Rossomanno Testimony, 153:25-154:6).

**Response: Controverted to the extent that Defendants' Exhibit Q purports to show this incident as it does not show protestors surrounding the Special Ops officers and throwing items at them. Plaintiff does not intend to make light of any bottles being thrown at the officers. However, at this point, out of hundreds of peaceful protestors (including Plaintiff), it appears that a couple of bottles were thrown.** *See* **Def. Exh. Q at 28:57.**

17.   Initially, members of SLMPD's Special Ops were sent to stop the destruction of the police vehicle. (Ex. B., Rossomanno Testimony, 154:7-18).

**Response: Uncontroverted.**

18.   Protestors surrounded the Special Ops officers and began to throw items at them. (Ex. B, Rossomanno Testimony, 154:9-20).

**Response: Controverted. Defendants' Exhibit Q purports to show this incident but does not show protestors surrounding the Special Ops officers and throwing items at them. Plaintiff does not intend to make light of any bottles being thrown at the officers. However, at this point, out of hundreds of peaceful protestors (including Plaintiff), it appears that a couple of bottles were thrown.** *See* **Def. Exh. Q at 28:57.**

19.   The Bicycle Response Team (BRT) was then called in to assist, but more items were thrown at them. (Ex. B, Rossomanno Testimony, 154:9-155:1).

**Response: Controverted. Defendants' Exhibit Q purports to show this incident but does not show protestors surrounding the BRT and throwing items at them. Plaintiff does not intend to make light of any bottles being thrown at the officers. However, at this point, out of hundreds of peaceful protestors (including Plaintiff), it appears that a couple of bottles were thrown.** *See* **Def. Exh. Q at 28:57.**

20.   Neither the Special Ops officers nor the BRT officers have any person protective equipment stronger than a bike helmet. (Ex. B, 154:9-155:23).

**Response: Uncontroverted.**

21.   As a result, SLMPD had to call in a CDT team. (Ex. B, 155:14-23).

**Response: Controverted to the extent that the video evidence, at this point, does not establish that CDT is necessary. Indeed, CDT's presence appears to escalate tension.** *See* **Def. Exh. G.**

22.   As the CDT officers arrived, people in the crowd continued to throw objects at the officers. (Ex. A, Jones Depo. 58:6-18; Ex. G at 4:51-8:14, Ex. H at 5:21-8:48; Ex. I, Deposition of Jonathan Vanarsdale, 61:22-62:7; Ex. J, Depositon of Brian DeMatteis, 23:10-19, 8:21-9:3; Ex. K, Deposition of Timothy Turner, 79:17-80:18; Ex. Q at 28:58-31:33).

**Response: Controverted in part. Plaintiff does not intend to make light of any bottles being thrown at the officers. However, at the time that CDT arrives, out of hundreds of peaceful protestors (including Plaintiff), it appears that a few bottles were thrown.** *See* **Def. Exh. G.**

23.   Those throwing objects at the police were standing in the middle of the group that was otherwise protesting. (Ex. G at 4:51-8:14; Ex. H at 5:21-8:48; Ex. Q at 28:58-31:33).

**Response: Controverted to the extent that the videos speak for themselves. It is not clear which group Defendants are describing. Def. Exhs. G, H, and Q show that the vast majority of protestors were peaceful and just standing around. At one point, around five individuals do, unfortunately, engage in breaking concrete and throwing it at the officers.** *Id.* **However, the individuals are not near Plaintiff.**

24.   Several protestors also broke up a concrete manhole covering and began throwing chunks of concrete at the officers. (Ex. Q at 28:58-31:33).

**Response: Uncontroverted that approximately five out of the hundreds of peaceful protesters present engaged in this violence. However, the individuals are not near Plaintiff.**

25.    That manhole covering was located on Tucker Blvd, just north of the intersection with

Clark. (Ex. Q at 28:58-31:33).

**Response: Uncontroverted.**

26.    One man in the middle of the crowd was observed with an assault rifle and was wearing a

bullet proof vest. (Ex. K, Turner Depo., 68:7-69:4).

**Response: Controverted in part. Plaintiff admits that Dhoruba Shakur, who is known**

**by the police to be present at many protests while exercising his Second Amendment rights,**

**was present at the protest. Plaintiff denies Defendants' assertion that he was "in the middle**

**of the crowd." In Exhibit G, he can be seen calmly standing directly in front of officers who**

**clearly do not treat him as a threat.** *See* **Def. Exh. G. at 00:41. Indeed, an officer converses**

**with him and calls him by his name.** *Id.* **starting at 1:00.**

27.    Officer Gilman was kicked, spat on, and a water bottle was thrown at and hit him in the

face. (Ex. F, Gilman Depo., 70:1-11).

**Response: Controverted to the extent that Defendants appear to be claiming that this**

**occurred near the time that they arrested Ms. Jones. This event described by Officer Gilman**

**occurred hours before Plaintiff was assaulted.** *See* **Plaintiff's to Defendants Statements of**

**Fact 11 and 12, above.**

28.    Officer Lankford was hit with a brick squarely on top of his head, and a thrown water bottle

hit him in the throat. (Ex. O, Lankford Depo., 27:20-28:13).

**Response: Controverted only to the extent that neither the police report nor the injury**

**report mentions anything being thrown at Lankford.** *See* **Exh. 2; Def. Exh. BB. Additionally,**

**of the injuries listed in the report, only one occurred near the time of the incident with Ms.**

**Jones. *See* Def. Exh. BB at 1. There is no allegation that Ms. Jones was involved in these incidents.**

29.     Officer DeMatteis was exposed to an unknown white substance that was thrown on him. (Ex. BB, CITY056145)

**Response: Controverted to the extent that Plaintiff's are attempting to claim that this occurred near the time of the assault of Ms. Jones. According to Ex. BB, this exposure happened at 3:34 pm, one and a half hours before DeMatteis assaulted Ms. Jones. *Id.* at 2. Clearly Officer DeMatteis was not injured as here remained on the scene and interacted with Plaintiff.**

30.     Six other officers filed injury reports that day regarding similar injuries. (Ex. BB).

**Response: Controverted to the extent that Defendants are attempting to relate these injuries to the assault of Ms. Jones. Of the injuries listed in the report, only one occurred near the time of the incident with Ms. Jones. *See* Def. Exh. BB at 1.**

31.     The CDT line was instructed to move forward toward the intersection to occupy the space of the broken manhole cover that was being used to assault officers. (Ex. F, Gilman Depo., 77:17-78:10; Ex.K, Turner Depo., 79:18-80:12).

**Response: Uncontroverted.**

32.     Sgt. Rossomanno declared the assembly unlawful, and began issuing dispersal orders from the loudspeaker in his vehicle at this time. (Ex. Q at 31:38-32:08; Ex. F, Gilman Depo., 86:7-87:1).

**Response: Controverted only to the extent that Defendants appear to be asserting that the dispersal order was given prior to the assault of Ms. Jones. The dispersal order was given**

**at the exact same time Defendants assaulted Ms. Jones.** *See*, **e.g., Ex. Q starting at 31:35, which shows Ms. Jones already on the ground as Officer Rossomanno is giving the order.**

33.     Sgt. Rossomanno gave six other dispersal orders thereafter. (Ex. Q 31:38-34:26)

      **Response: Controverted only to the extent that Defendants appear to be asserting that the dispersal orders were given prior to the assault of Ms. Jones. The first dispersal order was given at the exact same time Defendants assaulted Ms. Jones.** *See*, **e.g., Ex. Q starting at 31:35, which shows Ms. Jones already on the ground as Officer Rossomanno is giving the first dispersal order.**

34.     The CDT officers moved forward to take the intersection where objects, like the broken manhole cover, were being thrown at them. (Ex. B, 155:24-156:6) (Ex. I, Deposition of Jonathan Vanarsdale, 61:22-62:7).

      **Response: Uncontroverted.**

35.     As the CDT line advanced forward, officers instructed the crowd to "move back." (Ex. R at 0:09-0:10, 1:28-1:35; Ex. K, Turner Depo., 82:3-13, 92:4-8).

      **Response: Controverted to the extent that the orders are extremely difficult to hear.** *See* **Def. Ex. R at 0:09-0:10, 1:28-1:35. Indeed, Ms. Jones testified that she could not hear what the officers were saying. Def. Exh. A 66:11-15; 70:22-25.**

36.     Most of the people in the street obeyed the orders and moved back, out of the intersection. (*See* Ex. G; Ex. H; Ex. Q; Ex. R.; Ex. S).

      **Response: Uncontroverted.**

37.     As the CDT line moved toward the intersection, people from the crowd continued to throw objects at the CDT officers. (*See* Ex. G; Ex. H; Ex. Q; Ex. R.; Ex. S).

**Response: Controverted to the extent that Defendants are claiming that people threw items at the officers between the time the CDT started to move and Defendants assaulted Ms. Jones. The video evidence demonstrates that this happened simultaneously.** *See* **Def. Exhs. G-H, Q, R-S.**

<u>Plaintiff's Movement and Arrest</u>

38.     Jones joined the protests near Tucker Blvd. late that afternoon. (Ex. A, Jones Depo., 50:15-17).

       **Response: Uncontroverted.**

39.     For the time that she was protesting, Jones stayed in the area of the intersection of Clark and Tucker. (Ex. A, Jones Depo., 53:2-13).

       **Response: Uncontroverted.**

40.     Jones saw two people jumping on a police vehicle. (Ex. A, 59: 6-16; Ex. B, Rosomanno Testimony, 153:9-24; Ex. Q at 28:33-28:50).

       **Response: Uncontroverted.**

41.     While at the intersection, Jones witnessed people throwing objects at the police, including water bottles and rocks, and at least one chunk of concrete. (Ex. A, Jones Depo., 53:21-22; 56: 21-23; 57:8-11; Ex. G at 4:51-8:14, Ex. H at 5:21-8:48; Ex. Q at 28:58-31:33).

       **Response: Controverted in part. Ms. Jones admits that she saw people throwing objects but noted that they were not people in the protest and were off of the street to the side and that the protestors were yelling at them to stop. Def. Exh. A 53:8-54:3.**

42.     The people that Jones saw throwing rocks, bottles, and concrete, throwing rocks, bottles, and concrete at the officers were shouting profanities at the officers. (Ex. A, Jones Depo., 58:6-18).

**Response: Controverted only to the extent that the cited passage does not support this allegation.**

43.     Jones believes that those throwing items at police were approximately 40-50 feet away from her. (Ex. A, Jones Depo., 56:24-57:4).

**Response: Uncontroverted.**

44.     Jones could hear something being broadcast over a loudspeaker by officers, but claims she could not understand what was being said. (Ex. A, Jones Depo., 67:16-25).

**Response: Controverted only to the extent that the cited passage does not support this allegation. Ms. Jones admits, however, that she could not understand what was being said.**

45.     Anticipating that the CDT line would move forward, Jones told others in the crowd to stand behind her because she believed the police would not require an elderly white woman like her to comply with police commands. (Ex. A, Jones Depo., 70:11-16, 73:4-24; Ex. J, DeMatteis Depo., 7:17-8:8).

**Response: Controverted. First, Ms. Jones testified that she said this well before she was assaulted when she "first saw the police arrive on the scene." Def. Exh. A 69:11-22. Second, she testified that she did this because she was concerned that the police would shoot protesters and she thought they would not shoot her because they would not perceive her as a threat. *Id.* 70:1-16. Ms. Jones adamantly denies that it was her belief that "police would not require an elderly white woman like her to comply with police commands" and further states that she had no intention of disobeying any police orders. *Id.* 70:17-21, 71:5-8.**

46.     The CDT line moved forward, going East on Clark. (Ex. S at 0:00-0:03; Ex. R; Ex. II).

**Response: Uncontroverted.**

47.     Jones failed to move away from the CDT line as it moved forward into the intersection. (Ex. S; Ex. R; Ex. EE, Jones 1032-1033; Ex. K, Turner Depo., 94:13-95:24).

**Response: Controverted to the characterization of her "fail[ing]" to move away from the CDT line. Ms. Jones testified that she could not hear any orders to move back. Def. Exh. A at 70:22-25. Ms. Jones also testified that she closed her eyes in concentration to try to hear the officers and did not see them advancing. Def. Exh. A at 103:19-25.**

48.     The CDT line and Jones collided. (Ex. S at 0:00-0:03; Ex. R; Ex. EE).

**Response: Controverted to the extent that Defendants are minimizing what happened. The video and photographic evidence establishes that Defendants pushed Ms. Jones to the ground with their shields and then stomped on her. *See* Def. Exh. S 0:00 to 0:10. Further, it was not Ms. Jones who caused the "collision;" it was SLMPD officers. *Id.***

49.     As Turner moved forward toward Jones, he extended his left arm forward. (Ex. S at 0:01-0:02; Ex. EE, Jones 1040-1043).

**Response: Uncontroverted.**

50.     During this, it appears that Turner's left ring finger made contact with Jones' left wrist. (Ex. EE, Jones 1043).

**Response: Controverted to the extent that Defendants are minimizing what happened. The video and photographic evidence establishes that Defendants pushed Ms. Jones to the ground with their shields and then stomped on her. *See* Def. Exh. S 0:00 to 0:10. Moreover, the photographs also show someone holding Ms. Jones's hands back, preventing her from moving. Exh. 3, Bryant Photos, Nos. 14-15. Given his proximity and that his hand was already reaching out to her, this had to be Turner.**

51.     Before stumbling to the ground, Plaintiff likely made physical contact with the shield of
        officer Vanarsdale. (Ex. S at 0:01-0:02; Ex. EE, Jones 1037-1043).

        **Response: Controverted in part. Plaintiff admits that Vanarsdale pushed her to the
        ground with his shield. Defendants are minimizing what happened by using the passive tense
        and attributing the contact to Ms. Jones. The video and photographic evidence establishes
        that Vanarsdale and John Doe No. 2 pushed Ms. Jones to the ground with their shields and
        then stomped on her. *See* Def. Exh. S 0:00 to 0:10.**

52.     Jones fell to the ground. (Ex. S at 0:04).

        **Response: Controverted to the extent that Defendants are minimizing what
        happened. The video and photographic evidence establishes that Defendants pushed Ms.
        Jones to the ground with their shields, DeMatteis kept her pressed to the ground with the
        full weight of his body, and then DeMatteis and Hall kicked and stomped on her. *See* Def.
        Exh. S 0:00 to 0:10.**

53.     Officers Hall and DeMatteis stumbled over Jones as they attempted to maintain the CDT
        line. (Ex. L, Deposition of Joshua Hall 55:24-56:9; Ex. EE, Jones 1055-1058; Ex. II, Jones
        1053; Ex. J, Deposition of Brian DeMatteis, 7:10-9:24; Ex. EE, Jones 1051-1055; Ex. S at
        0:06-0:08).

        **Response: Controverted. The video and photographic evidence establishes that
        Defendants pushed Ms. Jones to the ground with their shields. *See* Def. Exh. S 0:00 to 0:10.
        The video also shows DeMattias and Hall stomping on her. *Id.* The photographic evidence
        also shows DeMatteis slamming her with his shield while she is on the ground with the full
        weight of his body and shows DeMatteis and Hall kicking and/or stomping her with their
        feet. Exh. 3, Bryant Photos, Nos. 22-28.**

14

54. After the CDT line passed Jones, she was assisted to her feet by officers Gilman, Lankford, and Simpson. (Ex. S at 0:32-38; Ex. F, Gilman Depo., 83:8-85:16; Ex. O, Lankford Depo., 14:3-15:6; Ex. CC, Deposition of Elijah Simpson, 10:21-11:8; Ex. DD, Simpson ID Photo).

**Response: Uncontroverted.**

55. Officer Simpson restrained Jones' hands and walked her back to be processed. (Ex. CC, Simpson Depo., 10:21-11:8).

**Response: Uncontroverted.**

56. As they were walking, Simpson handed Jones off to officers Hellmeier and Singharath, who touched Jones' arm as she was led away. (Ex. M, Deposition of Richard Hellmeier, 9:6-17, 44:13-45:7; Ex. N, Deposition of Sisavath Singharath, 8:23-10:15; Ex. GG; Ex. HH; Ex. S at 1:10).

**Response: Uncontroverted.**

57. Jones was arrested for interfering. (Ex. K, Turner Depo., 83:19-23; Ex. F, Gilman Depo., 85:24-6).

**Response: Uncontroverted.**

58. Out of the many people at the intersection of Tucker and Clark who were protesting along with Plaintiff, only those who refused orders to back up were stumbled over and/or arrested. (*See* Ex. R; Ex. S).

**Response: Controverted to the extent that the citations to two cited videos do not support this assertion. Jones has no way of knowing who was arrested, where they are in the videos, or what they did. Certainly, the videos do not establish that on their own. This is also controverted to the extent that Defendants are minimizing what happened as Ms. Jones being "stumbled over." The video and photographic evidence establishes that Defendants pushed**

**Ms. Jones to the ground with their shields.** *See* **Def. Exh. S 0:00 to 0:10. The video also shows DeMattias and Hall stomping on her.** *Id.* **The photographic evidence also shows DeMatteis slamming her with his shield while she is on the ground, DeMatteis pressing her to the ground with the full weight of his body, and DeMatteis and Hall kicking and/or stomping her with their feet. Exh 3, Bryant Photos, Nos. 22-28.**

59. From the time she was assisted to her feet to the time she was transported to a City jail, Jones' only complaint is that she was walked back to the processing area too quickly. (Ex. A, Jones Depo., 119:18-120:16).

   **Response: Controverted to the extent that the cited passage indicates that Ms. Jones also complained that the officers were pulling her and that they did not treat the pepper spray in her eye.** *See* **Def. Exh. A, Jones Dep. at 119:1-120:11. Further Jones complained that officers refused to give her inhaler.** *Id.* **at 89:16-90:7.**

60. The physical contact police made with Jones was incidental, and not a use of force. (Ex. K, Turner Depo., 94:4-96:1).

   **Response: Controverted. The video and photographic evidence establishes that Defendants pushed Ms. Jones to the ground with their shields, and DeMatteis pressing her to the ground with the full weight of his body.** *See* **Def. Exh. S 0:00 to 0:10. The video also shows DeMattias and Hall stomping on her.** *Id.* **The photographic evidence also shows DeMatteis slamming her with his shield while she is on the ground and shows DeMatteis and Hall kicking and/or stomping her with their feet. Exh 3, Bryant Photos, Nos. 22-28.**

61. Jones suffered only soreness and minor bruising from the circumstances of her fall. (Ex. A, Jones Depo., 134:24-136:6; Ex. JJ).

**Response: Controverted. The video and photographic evidence establishes that Defendants pushed Ms. Jones to the ground with their shields and DeMatteis pressing her to the ground with the full weight of his body.** *See* **Def. Exh. S 0:00 to 0:10. The video also shows DeMattias and Hall stomping on her.** *Id.* **The photographic evidence also shows DeMatteis slamming her with his shield while she is on the ground and shows DeMatteis and Hall kicking and/or stomping her with their feet. Exh 3, Bryant Photos, Nos. 22-28. Jones testified at length about the pain from being pepper sprayed and the psychological trauma inflicted upon her, for which she sought treatment, as she was violently thrown to the ground and then trampled over by police officers. Exh. A, Jones Dep. at 67:1-23; 149:18-152:15, 153:4-155:5, 181:22-182:2. Far from minor bruising, she stated that the bruises lasted a month. Exh. A, Jones Dep. at 181:22-182:2.**

62.     Jones admits that her fall wasn't quite as bad as it looks as the officers stepped over her, not on her. (Ex. KK).

**Response: Controverted. When presented with this letter during her deposition, Ms. Jones explained that she only wrote this so her cousin would not worry about Ms. Jones. Exh. A, Jones Dep. 83:10-85:1. Moreover, the video also shows DeMattias and Hall stomping on her.** *Id.* **The photographic evidence also shows DeMatteis slamming her with his shield while she is on the ground, DeMatteis pressing to the ground with the full weight of his body, and DeMatteis and Hall kicking and/or stomping her with their feet. Exh 3, Bryant Photos, Nos. 22-28.**

63.     There were no formal charges issued against Jones. (Ex. A, Jones Depo., 138:24-139:5).

**Response: Uncontroverted.**

64.   Before Jones attended the protest on September 15, 2017, she had in mind to stand her ground and defy police commands. (Ex. FF).

**Response: Controverted. Ms. Jones admits that she peacefully stood in front of the police with her fingers making a peace sign.** *See* **Def. Ex. R. Nothing in Def. Ex. FF suggests that Ms. Jones was going to "defy police commands." Moreover, Ms. Jones adamantly denies that allegation and testified that she had no intention of disobeying any police orders.** *Id.* **70:17-21, 71:5-8.**

65.   Defendant officers did not participate in issuing a summons to Jones. (Ex. F, Gilman Depo.; Ex. I, Vanarsdale Depo; Ex. J, DeMatteis Depo., Ex. K, Turner Depo., Ex. L, Hall Depo., Ex. M, Hellmeier Depo., Ex. N, Singharath Depo., Ex. O, Lankford Depo., Ex. CC, Simpson Depo.).

**Response: Uncontroverted.**

## Monell Facts

66.   SLMPD's use of force policy is contained in Special Order 1-01. (Exhibit P, Special Order 1-01, Use of Force).

**Response: Uncontroverted.**

67.   Each officer is required to take a 62-hour defensive tactics course at the Academy, which teaches appropriate uses of force in accordance with SLMPD policy.  (Exhibit W, POST Defensive Tactics Training Curriculum).

**Response: Uncontroverted.**

68.   After graduating from the Academy, officers are tested monthly on City's use of force policy via the Policy Acknowledgment System ("PASS"). (Exhibit T, Larson Depo., 49:12-50:7; Ex. E, Marks Depo., 35:19-37:8).

**Response: Controverted to the extent that the vast majority of the questions relate to the use of deadly force.**

69.    Officers are also required to attend continuing education courses with respect to use of force. (Ex. T, Larson Depo., 45:13-46:1; Ex. U, Rossomanno Depo., 108:25-109:12).

**Response: Controverted. Nothing in those depositions supports the assertion that officers are required to attend continuing education courses with respect to use of force. In the testimony from Larson, he states that officers must attend continuing education courses but does not specify that they have to be for the use of force. Def. Exh. T, Larson Depo., 45:13-46:1. In the testimony from Rossomanno, he discusses the PASS "test" described in Statement of Fact 68 but does not mention continuing education courses. Def. Ex. U, Rossomanno Depo., 108:25-109:12.**

70.    Sgt. Rossomanno went through the final order in *Templeton v. Dotson, et al*, after the order was entered. (Ex. U, Rossomanno Depo., 12:20-14:3).

**Response: Controverted to the extent it mischaracterizes his testimony. Rossomanno testified that he was "made aware" of the order but received no formal training regarding the change in policy. Def. Exh. U, Rossomanno Depo., 12:20-14:3.**

71.    By the time that order was entered, SLMPD was already doing or training its CDT officers to operate in ways that would be compliant with that agreement. (Ex. U, Rossomanno Depo., 13:23-15:21).

**Response: Controverted. This misstates his testimony. Rossomanno was stating that, in his opinion, the order was unnecessary because CDT was already doing those things. This flies in the face of the findings made by Judge Jackson in *Templeton*.**

72.    In response to the order issued in *Templeton v. Dotson,* SLMPD modified SO 1-01

regarding the use of force to be in compliance with the order. (Ex. T, Larson Depo., 47:1-19).

**Response: Uncontroverted.**

73. All SLMPD employees were sent a directive with the _Templeton_ order included via the PASS system, and were required to verify that they had read the order. (Ex. T, Larson Depo., 49:12-20).

**Response: Uncontroverted.**

74. In August 2017, the Police Legal Division, in preparation of the Stockley verdict, conducted a training with all supervising officers about protest law. (Ex. AA, Protest Law Presentation; Ex. K. Turner Depo., 69:11-18).

**Response: Uncontroverted.**

75. The training included a summary of constitutional law principles regarding protests, including First Amendment protections, information about the Templeton order, and refreshers on various ordinances relevant to protests. (Ex. AA, Protest Law Presentation).

**Response: Uncontroverted.**

76. SLMPD has an internal affairs division (IAD) that investigates every complaint made against its officers. (Exhibit U, Rossomanno Depo., 255:4-23; Ex. V, Deposition of Daniel Howard, 20:21-21:23; 33:4-34:6).

**Response: Controverted. Nothing in the cited testimony supports the assertion that IAD investigates every complaint made against SLMPD officers. Indeed, Rossomanno testified that IAD "makes the determination on whether or not they entertain [a civilian complaint.]" Moreover, former IAD officer Richard Hellmeier testified at length about the IAD investigation process and testified that many complaints are logged by not investigated.**

*See* **Exh. 4, Hellmeier Dep. 30:10-31:22. Hellmeier also testified that he would frequently just attempt to talk complainants out of making their complaints to shortcut the need for an investigation.** *Id.* **Moreover, numerous officers have confirmed that IAD did not investigate any of the many complaints made by protesters as a result of the 2017 protests, including the complaint made in this case.** *See, e.g.,* **Def. Exh. K, Turner Dep. 143:23-144:5.**

77.     The process has been described as one that has multiple levels of review, including up the SLMPD Inspector and the Commissioner. (Exhibit V, Howard Depo., 20:21-21:23; 33:4-34:6).

       **Response: Uncontroverted.**

78.     During the course of discovery, City has produced well over twelve thousand documents pertaining to 129 IAD investigations from 2012-2017 of various offenses, including excessive force, unnecessary force, physical abuse, and uncivil treatment. (Ex. X, Affidavit of Jennifer Schott).

       **Response: Uncontroverted.**

79.     Some of those investigations resulted in discipline or dismissal of police officers.  (Ex. F, Gilman Depo., 16:7-17:12).

       **Response: Uncontroverted.**

80.     Officers are required to document uses of force. (Ex. P, Special Order 1-01, Section VII).

       **Response: Uncontroverted that the policy states that uses of for must be documented. Controverted that this policy was followed in this case as numerous officers failed to document uses of force, including those in this case.**

81.     Supervisors review the report, and forward the report up the chain of command for review. (Ex. Z, Special Order 9-01, Section III).

       **Response: Uncontroverted that the policy states that uses of for must be documented. Controverted that this policy was followed in this case as numerous officers failed to document uses of force, including those in this case.**

82.    If any level of command believes the use of force was excessive or unwarranted, he may initiate disciplinary proceedings against the officer who used the force. (Ex. Y, Special Order 6-02, Section II).

       **Response: Uncontroverted that the policy states that uses of for must be documented. Controverted that this policy was followed in this case as numerous officers failed to document uses of force, including those in this case.**

83.    Supervisors are immediately notified of an officer's use of force, and often travel to the scene where force was used. (Ex. F, Gilman Depo., 19:14-20:7; Ex. U, Rossomanno Depo., 31:18-33:14).

       **Response: Uncontroverted that the policy states that uses of for must be documented. Controverted that this policy was followed in this case as numerous officers failed to document uses of force, including those in this case.**

84.    At the scene, supervisors inquire about the use of force used, and follow-up with any relevant questions to determine the circumstances of the use of force. (Ex. F, Gilman Depo., 21:20-27:5; Ex. U, Rossomanno Depo., 31:18-33:14).

       **Response: Uncontroverted that the policy states that uses of for must be documented. Controverted that this policy was followed in this case as numerous officers failed to document uses of force, including those in this case.**

85.    If the supervisor is unsatisfied with the circumstances under which force was used, he can initiate disciplinary proceedings against the officer by reporting him to internal affairs.

(Ex. F, Gilman Depo., 30:5-30:25).

**Response: Uncontroverted that the policy states that uses of for must be documented. Controverted that this policy was followed in this case as numerous officers failed to document uses of force, including those in this case.**

86.     Officers can and have reported fellow officers to internal affairs for unjustified uses of force. (Ex. F, Gilman Depo., 31:1-31:9).

      **Response: Uncontroverted.**


## PLAINTIFF'S ADDITIONAL STATEMENT OF UNCONTROVERTED FACTS

**A.      The Police Assaulted Ms. Jones**

1.      On September 15, 2017, Ms. Jones heard about the Stockley verdict while on her way to the St. Louis Bread Company on Brentwood Boulevard. *See* Def. Exh. A, Jones Dep. 41:8-42:10.

2.      At about 4:00 pm, at St. Louis Bread Co., she chatted with an elderly stranger and his granddaughter. The three of them discussed the inadequacy of the verdict, and Ms. Jones felt inspired to attend the protest she heard was underway downtown. *See* Def. Exh. A, Jones Dep. 42:11-44:1.

3.      After parking downtown, she walked around trying to find someone that could tell her where the protests were. *See* Def. Exh. A, Jones Dep. 48:20-12.

4.      Ms. Jones asked a police officer where the protest was taking place. The officer was not from the area, so he did not know where to direct her. *See* Def. Exh. A, Jones Dep. 60:5-22.

23

5.      Eventually, Ms. Jones found a place to park and encountered a young couple with whom she headed towards the site of the protest. *See* Def. Exh. A, Jones Dep. 60:5-22.

6.      At the peaceful protest, Ms. Jones listened to a clergyman speak and engaged in some peaceful protest chants. *See* Def. Exh. A, Jones Dep. 49:16-50:12.

7.      After a while, Ms. Jones looked around and noticed a substantial police presence. She feared that the police would hurt, or even kill, someone. *See* Def. Exh. A, Jones Dep. 60:5-61:15, 70:1-2.

8.      Around 5:20 pm in the afternoon, Ms. Jones heard the police saying something over a loudspeaker, but she could not make out the words. *See* Def. Exh. A, Jones Dep. 66:11-25.

9.      Ms. Jones did not hear any orders to disperse or orders to move back. *See* Def. Exh. A, Jones Dep. 66:11-25.

10.     The environment grew tense. People were yelling, the police continued the unintelligible announcements, and a few people started throwing rocks. *See* Def. Exh. A, Jones Dep. 55:21-56:7.

11.     Protesters yelled for calm, as the protest was peaceful. *See* Def. Exh. A, Jones Dep. 53:24-54:3.

12.     As Ms. Jones turned her head to try to make out what the officers were saying, she made eye contact with an officer, John Doe No. 1. *See* Def. Exh. A, Jones Dep., 67:1-12, 121:25-122:11.

13.     John Doe No. 1 looked at Ms. Jones with abject disgust before spraying her with pepper spray. *See* Def. Exh. A, Jones Dep., 67:1-12, 121:25-122:11.

14.     Ms. Jones had done nothing wrong. She had committed no crimes. She had not harmed officers or anyone else. Jones Dep. 50:20-51:3.

15.     Yet, she was pepper sprayed, leaving her crying out as her eyes burned more than she had ever thought possible. She could not see. *See* Def. Exh. A, Jones Dep., 67:1-12, 121:25-122:11.

16.     Right after, Ms. Jones thought she had been plowed by a truck. Instead, Defendants Turner, Vanarsdale, and John Doe No. 2[1] rammed her with their bodies and shields, throwing her to the ground. *See* Def. Exh. A, Jones Dep., 67:17-68:5; Def. Exh. S 0:00 to 0:10; Exh. 3, Bryant Photos, Nos. 22-28.

17.     However, the photographic and video evidence establishes that she was pushed by the team of Sgt. Turner, Officer Vanarsdale and John Doe No. 2. *See* Def. Exh. S 0:00 to 0:10; Exh. 3, Bryant Photos, Nos. 22-28. In the Fox 2 video, while Sgt. Turner stands next to them attempting to grab Ms. Jones, Officers Vanarsdale and John Doe No. 2 very clearly use the shields to push Ms. Jones as she is turning away from them. *Id.*

18.     Ms. Jones curled herself into a fetal position. Blinded by the pepper spray and feeling officers' feet strike her again and again, Ms. Jones feared that officers would break her ribs or crush her skull. She thought she was going to die. *See* Def. Exh. A, Jones Dep. 80:16-81:7, 84:22-24.

19.     Defendant DeMatteis callously shoved his shield on top of Ms. Jones knocking her to the ground. *See* Def. Exh. S, 00:00-0:10; Exh. 3, Bryant Photos Nos. 22-28. He then continues use force to smash her into the pavement. *Id.* He keeps his shield and the full weight of his body

---

[1]     Nearly four years after the event at issue, the City claims that it cannot identify John Doe 2 even though Plaintiff has obtained and provided the City with multiple close-up pictures of John Doe 2, and there is a finite list of possible officers that could be John Doe 2. Whether it is through incompetence or a willful decision to not fully investigate this matter, the City's failure to identify this officer speaks volumes. Allegedly, they assigned their own investigative arm, the SLMPD, to identify this officer and have failed. As discussed further in the *Monell* section of this brief, this is indicative of the City's failure to investigate and discipline its officers.

on her. *Id.* After DeMatteis eventually gets off of her, he and Hall stepped on and kicked Ms. Jones's body as they walked over her. *Id.* All of this was avoidable and was done intentionally.

20.     Their fellow officers walked over and around Ms. Jones without offering her any assistance. *See* Def. Exh. S.

21.     Eventually, officers picked her up and arrested her. *See* Def. Exh. S.

22.     Suffering from the effects of the pepper spray and trauma, Ms. Jones began to have an asthma attack. *See* Def. Exh. A, Jones Dep. 89:22-90:7.

23.     Ms. Jones then asked an officer who was detaining her for her inhaler. He refused. Inexplicably, the officer (who is not a medical professional) made numerous unsuccessful attempts to administer Ms. Jones's inhaler himself through the police van door. *See* Def. Exh. A, Jones Dep. 89:22-91:4.

24.     Reeling from the burning in her eyes, the aches from being knocked down, and the chest soreness caused by her asthma attack, Ms. Jones again feared that she might die. *See* Def. Exh. A, Jones Dep. 89:22-91:4, 191:7-15.

25.     Ms. Jones suffered for over two hours while she and about four other arrestees waited to be transported. *See* Def. Exh. A, Jones Dep. 93:25-94:2.

26.     Police took Ms. Jones and the other arrestees to a building with which Ms. Jones was not familiar, and she still could not see. *See* Def. Exh. A, Jones Dep. 94:3-10.

27.     There, officers badgered and mocked Ms. Jones as she attempted to cope and fill out forms. Worse, an officer ignored Ms. Jones's complaint that she could not see and was having trouble breathing, refused to assist her, and allowed her to bump into walls twice. *See* Def. Exh. A, Jones Dep. 128:10-130:22.

28.     Ms. Jones was directed into a cold cell containing a filthy toilet with no toilet paper, no soap, and no access to drinking water. Ms. Jones and the other arrestees were given nothing to eat. Ms. Jones was unable to sleep, as her back ached from the officers' abuse. At 11:00 am, Ms. Jones again inquired about when she would be released. Finally, the officers released her at 12:00 pm. *See* Def. Exh. A, Jones Dep. 131:22-132:10.

29.     Before September 15, 2017, Ms. Jones was already in treatment for complex post-traumatic stress disorder, anxiety, and depression. Following her assault, arrest, and inhumane confinement, Ms. Jones's mental health deteriorated considerably. *See* Def. Exh. A, Jones Dep. 149:18-150:7.

30.     For the first month following the protest, Ms. Jones had nightmares, and she was unable to concentrate. She stayed in her apartment, too afraid to venture out. She had several panic attacks when reminded of her arrest, including while substitute teaching. This resulting in her losing her job. *See* Def. Exh. A, Jones Dep. 164:17-24, 165:20-168:12.

31.     Her mental health continued to deteriorate. In April 2018, she decided to get a fresh start by moving to Michigan and putting space between her and the SLMPD. That did not help. Even in Michigan, she just stayed in her apartment for months. *See* Def. Exh. A, Jones Dep. 188:21-189:17.

32.     The trauma Ms. Jones suffered at the hands of the SLMPD continues to haunt her. She continues to have panic attacks when she sees police. She is haunted by the look of hatred in the eyes of the SLMPD officer who pepper sprayed her. *See* Def. Exh. A, Jones Dep. 188:21-189:17.

33.    The City's Real Time Crime Center captured the period between the busses leaving and the incident in this case, which occurred at approximately 5:17 pm. *See* Exhibit 1, RTCC Video at 5:17:32.

34.    Before this, people were largely standing around the stretch of Tucker from Market to Clark that the police had closed hours before. *See* Exhibit 1, RTCC Video at 1:30:00 - 5:17:32.

35.    Similarly, the police report does not indicate any violent activity or arrests between 2:00 pm and 5:00 pm. *See* Exh. 2, Police Report at CITY 000435-000436.

36.    The SLMPD CDT teams have "arrest teams" that are sent out in groups of eight officers. Def. Exh. K, Turner Dep. 60:25-61:17.

37.    These officers each have different roles. Def. Exh. K, Turner Dep. 60:25-61:17.

38.    Some carry shields to protect the officers, some carry batons to ward off anyone attempting to interfere in the arrest, and two officers are charged with actually putting hands on the arrestee. *Id.*; Def. Exh. F. Gilman Dep. 43:21-45:1, 46:22-47:3.

39.    Turner was part of a group of officers, along with Vanarsdale and John Doe No. 2, who knocked Jones to the ground. *See* Def. Exh. S 0:00 to 0:10; Exh. 3, Bryant Photos, Nos. 22-28.

40.    Turner admitted that he had the power and authority to order the officers to arrest Ms. Jones. Def. Exh. K, Turner Dep. 61:23-62:4.

41.    Turner stated that he made the decision not to arrest Ms. Jones because "he did not see her throwing anything at us or an immediate threat." Def. Exh. K, Turner Dep. 96:21-97:3; 97:9-98:1.

42.    Defendant DeMatteis that he was trained that, while advancing as a unit, he should use his shield to push protestors away. Def. Exh. J, DeMatteis Dep. 36:5-37:4.

43.     Furthermore, if that person falls to the ground, SLMPD officers are trained to keep "progressing in the direction we're told to." Def. Exh. J, DeMatteis Dep. 36:5-37:4.

***Expert Testimony***

44.     Plaintiff's expert, Geoffrey Alpert, agreed with the assessment that the Defendant Officers used excessive force. Exh. 5, Alpert Expert Report at 3-4.

45.     Specifically, Dr. Alpert finds that "Ms. Jones was standing on the street not posing a threat when she was sprayed with a less-lethal weapon." Exh. 5, Alpert Expert Report at 3-4.

46.     This use of force was excessive, unreasonable and contrary to nationally recognized police standards and the Consent Decree." Exh. 5, Alpert Expert Report at 3-4.

47.     Dr. Alpert also opines that a "reasonable officer should have tried to communicate with Ms. Jones and warn her before using force on her to cause pain or compliance." Exh. 5, Alpert Expert Report at 3-4.

48.     Dr. Alpert adds that "[P]roperly trained officers are aware of citizens' First Amendment rights to criticizing police and/or officers. The use of any force against a citizen who is merely exercising her First Amendment rights is unreasonable and contrary to appropriate and reasonable police actions and the Consent Decree" and that the "inappropriate use of force by the officer who pushed her down and the officers who marched on and over her without rendering assistance are proximate causes of the injuries sustained by Ms. Jones." Exh. 5, Alpert Expert Report at 3-4.

49.     As to the physical contact Defendants made with Ms. Jones, Finally, Dr. Alpert states the "inappropriate use of force by the officer (now known to be De Matteis) who pushed her down and the officers who marched on and over her without rendering assistance are proximate causes of the injuries sustained by Ms. Jones." Exh. 5, Alpert Expert Report at 3-4.

50.     According to the report, De Matteis "knew or should have known that using a shield to push down an elderly and non-threatening person without exigent circumstances is contrary to his duty as a police officer whose main goal is to protect public safety and the rights of the public." Exh. 5, Alpert Expert Report at 3-4.

51.     Dr. Alpert found, that Defendants "knew or should have known that walking on and over an elderly and non-threatening person without exigent circumstances is contrary to his duty as a police officer whose main goal is to protect public safety and the rights of the public." Exh. 5, Alpert Expert Report at 3-4.

52.     Dr. Alpert opined that "(p)roperly trained officers are aware of citizens' First Amendment rights to criticizing police and/or officers. The use of any force against a citizen who is merely exercising his First Amendment rights is contrary to appropriate and reasonable police actions and nationally-accepted police practices." Exh. 5, Alpert Expert Report at 3-4.

53.     He also found that "[P]roperly trained officers are aware of citizens' First Amendment rights to criticizing police and/or officers. The use of any force against a citizen who is merely exercising her First Amendment rights is unreasonable and contrary to appropriate and reasonable police actions and the Consent Decree." Exh. 5, Alpert Expert Report at 3-4.

54.     Finally, Dr. Alpert found the "lack of command and control which sanctioned the excessive use of force by unknown officers is the cause of the injuries sustained by Ms. Jones." Exh. 5, Alpert Expert Report at 3-4.

***Monell***

55.     On December 11, 2014, a federal judge in this District issued a temporary restraining order against the City regarding the constitutionality of its chemical munitions policy. *See* D.E. 12, *Templeton v. Dotson*, No. 4:14-cv-02019 (E.D. Mo. Dec. 11, 2014).

56.     On March 25, 2015, SLMPD entered into a settlement agreement, where it agreed

as follows:

> A.     Defendants and their agents, servants, employees, and representatives, will not enforce any rule, policy, or practice that grants law enforcement officials the authority or discretion to:
> (1)     utilize tear gas, inert smoke, pepper gas, or other chemical agents (collectively, "chemical agents") for the purpose of dispersing groups of individuals who are engaged in non-criminal activity:
> (a)     without first issuing clear and unambiguous warnings that such chemical agents will be utilized;
> (b)     without providing the individuals sufficient opportunity to heed the warnings and exit the area;
> (c)     without reasonably attempting to minimize the impact of such chemical agents on individuals who are complying with lawful law enforcement commands; and
> (d)     without ensuring that there is a means of safe egress from the area that is available to the individuals and announcing this means of egress to the group of individuals.
> (2)     utilize chemical agents on individuals engaged in non-criminal activity for the purpose of frightening them or punishing them for exercising their constitutional rights.
> B.     Provided, however, that Paragraph A hereof shall not be applicable to situations that turn violent and persons at the scene present an imminent threat of bodily harm to persons or damage to property, and when law enforcement officials must defend themselves or other persons or property against such imminent threat.

*See* Exhibit 6, Settlement Agreement in *Templeton v. Dotson*, No. 4:14-cv-02019 (E.D. Mo. Mar.

25, 2015) at 1-2.

57.     On July 10, 2015, SLMPD issued a Special Order allegedly implementing the

changes required by *Templeton v. Dotson*, Case No. 4:14-cv-02019, D.E. 12 (Dec. 11, 2014). *See*

Exh. 7, Section XIII of SLMPD Special Order 1-01.[2]

58.     Defendant Vanarsdale testified that he had never heard of *Templeton v. Dotson*. *See*

Def. Exh. I, Vanarsdale Dep. 33:14-34:9.

---

[2]     This special order was produced as Confidential, but the City has agreed that we can file these special orders publicly.

59.     Defendant Vanarsdale testified that he was vaguely aware of a change in SLMPD policy regarding chemical munitions but could not describe the changes. *See* Def. Exh. I, Vanarsdale Dep. 33:14-34:9.

60.     He also testified that he had not been trained regarding any change to the policy. *See* Def. Exh. I, Vanarsdale Dep. 33:14-34:9.

61.     A litany of other deposed officers echoed their lack of having knowledge of the *Templeton* settlement or decree. *See* Exh. 8, Bayless Dep. 53:11-54:16; Exhibit 9, Officer Bain Dep. 31:20-22; Exhibit 10, Officer Burle Dep. 98:17-99:1; Exhibit 11, Officer Daut Dep. 70:19-22; Exhibit 12, Officer Flowers Dep. 76:8-10; Exhibit 13, Officer Gaddis Dep. 54:6-11; Exhibit 14, Officer Koerper Dep. 24:7-15; Exhibit 15, Officer Lee Dep. 47:5-12; Exhibit 16, Officer Rachas Dep. 45:12-19; Exhibit 17, Officer Schaffer Dep. 36:12-17; Exhibit 18, Officer Martorano Dep. 16:7-10; Exhibit 19, Officer Schroeder Dep. 16:9-24, 18:10-12; Exhibit 20, Officer Khan Dep. 14:19-21, 15:6-24; Exhibit 21, Sgt. Marks Dep. 31:1-5; 38:19-22.

62.     In fact, this same lack of knowledge permeated the highest ranks of the police department. When asked about the *Templeton* settlement or decree, Major Daniel Howard, one of the highest-ranking supervisors in the Department stated that he had never heard of *Templeton* or the settlement agreement.

63.     When asked about the *Templeton* settlement or decree, Major Daniel Howard, one of the highest-ranking supervisors in the Department answered as follows:

```
16    Q Have you ever heard of a case called
17    Templeton v. Dotson?
18    A Say it again.
19    Q Have you heard of a case called Templeton v.
20    Dotson?
21    A No.
22    Q Are you aware that SLMPD entered into a
23      settlement agreement in that case?
```

24      A No.

*See* Exhibit 32, Maj. Howard Dep. 141:16-24.

64.     Line supervisors were similarly unaware of the *Templeton* settlement or decree. *See*

Exhibit 23, Lt. Aubuchon Dep. 114:25-115:8; Exhibit 24, Sgt. Re Dep. 99:14-100:5.

65.     Even Lt. Timothy Sachs, who was second in command of SLMPD's Stockley

response and who reported directly to Lt. Colonel Leyshock, the incident commander, was bereft

of any knowledge about the *Templeton* settlement or decree at the time of Jones's assault.

> 14  Q Do you remember the – are you familiar with
> 15  the *Templeton* decision?
> 16  A I am not.
> 17  Q Okay. Are you aware that the City and the
> 18  police department entered into a consent judgment
> 19  regarding the use of chemical munitions?
> 20  A I was – I was made aware of it at some
> 21  point, but I don't remember when.
> 22  Q Could it have been after September 17, 2017?
> 23  A It could have been, yes.

*See* Exhibit 25, Lt. Sachs Dep. 258:14-23.

66.     The same officers and supervisors could not remember being retrained on SLMPD

changes to its chemical munitions policy in light of *Templeton* or could articulate any such changes

prior to Jones's assault. *See* Exhibit 8, Officer Bayless Dep. 53:11-54:16; Exhibit 9, Officer Bain

Dep. 31:23-32:1; Exhibit 10, Officer Burle Dep. 99:2-99:100:4; Exhibit 11, Officer Daut Dep.

70:23-71:5; Exhibit 12, Officer Flowers Dep. 76:11-24; Exhibit 13, Officer Gaddis Dep. 55:23-

56:2; Exhibit 14, Officer Koerper Dep. 24:7-24; Exhibit 15, Officer Lee Dep. 47:13-16; Exhibit

16, Officer Rachas Dep. 45:20-46:2; Exhibit 17, Officer Schaffer Dep. 36:18-23; Exhibit 19,

Officer Schroeder Dep. 16:20-17:22; Exhibit 20, Officer Khan Dep. 14:19-21, 15:6-24; Exhibit

21, Sgt. Marks Dep. 32:4-14, 38:19-22.

67.     Once again, the testimony of Major Howard is telling:

25    Q At any point in 2014, were you informed that
1    there was a change to SLMPD policy regarding chemical
2    munitions?
3    A I don't remember the specifics. I don't
4    remember the specifics.
5    Q But you were informed that there was a
6    change?
7    A There was -- there was something that I
8    remember that came down and I do not remember the
9    specifics.
10    Q When you say something came down, what do
11    you mean?
12    A Well, I thought there was a ruling and was
13    there Judge Jackson? I don't know. I shouldn't -- I
14    shouldn't unless I recall. But I -- I remember there
15    was something about mace. I don't remember what it
16    was.
17    Q Were you ever retrained in 2014 regarding
18    mace or pepper spray?
19    A I was not.
20    Q Were you asked to review anything regarding
21    mace or pepper spray in 2014?
22    A I don't recall.
23    Q Were you asked to talk to your subordinates
24    about chemical agents such as mace or pepper spray in
25    2014?
1    A I don't recall that. And it would have been
2    my captains anyway.
3    Q After 2014, do you recall receiving any
4    training regarding pepper spray or mace?
5    A I do not.
6    Q After 2014, do you recall being informed of
7    any changes to policy regarding pepper spray or mace?
8    A I don't remember specifically.
9    Q After 2014, did you ever advise your
10    subordinates of any changes to policy regarding pepper
11    spray or mace?
12    A I don't recall.

*See* Exhibit 22, Maj. Howard Dep. 141:25-143:12.

68.    Sadly, Lt. Sachs was equally ignorant of any such policy changes or trainings before

Aldridge was assaulted:

24     Q And did you ever receive any specific
25     training regarding the terms of the Templeton
1      agreement?
2      A I did not.
3      Q And did you receive any training regarding
4      any changes in department policy regarding use of
5      chemical munitions as a result of the *Templeton*
6      agreement?
7      A I did not.
8      Q And did you provide any training to your
9      subordinates regarding the same?
10     A No.
11     Q All right. Do -- do you know if the CDT was
12     trained in the terms of the *Templeton* agreement?
13     A I believe, yes, because I -- I believe
14     that's where I heard the initial -- the name of the
15     decision.
16     Q Okay. And what do you remember about that
17     training?
18     A Next to nothing other than that terminology
19     was used.
20     Q And do you -- do you -- do you know what
21     changes in St. Louis Police Department procedures
22     regarding chemical munitions happened as a result of
23     *Templeton*?
24     A I do not.
25     Q And do you remember any training regarding
1      the changes in chemical munition policy as a result of
2      *Templeton -- Templeton* decision?
3      A No.

*See* Exhibit 25, Lt. Sachs Depo. 258:24-260:3.

69.     SLMPD Policy requires each officer to report a use of force. Pursuant to Section VII of Special Order 1-01, for any non-lethal use of force "[a]n original report will be prepared containing complete details, including the circumstances surrounding the application of the non-deadly force; the non-deadly force method employed by the officer; and the injuries sustained, if any. The report will always require the approval of a Watch Commander." *See* Exh. 26.

70.     In this case, Defendant Turner, Vanarsdale, Dematteis, Hall and John Does No. 1 and 2 violated SLMPD policy by failing to properly document their use of force. In the police

report regarding this incident, Defendants did not document any of the force used against Ms. Jones. *See* Exh. 2, Police Report at CITY 000435-000436.

71.     The report mentions that "OC spray was used…" but does not identify any of the officers who used the OC spray. *See* Exh. 2, Police Report at CITY000436.

72.     The report also falsely states that Ms. Jones "tripped and fell to the ground in front of the line." As the report does not even indicate force was used, it does not identify the officers who used force against Ms. Jones. *See* Exh. 2, Police Report at CITY000436.

73.     As discussed above, the photographic and video evidence establishes that this statement is false. *See* Def. Exh. S 0:00 to 0:10; Exh. 3, Bryant Photos, Nos. 22-28.

74.     Moreover, Defendant Turner can be seen on video and in photographs using a fogger to pepper spray numerous people in the moments after Ms. Jones was trampled, including someone who was trying to help her. *See* Def. Exh. S.

75.     Defendant Turner did not document this use of force anywhere in the police report. *See* Exh. 2, Police Report at CITY 000435-000436.

76.     Despite this incident being captured on numerous videos and photographs and receiving extensive media coverage, SLMPD did not investigate the incident or the failure to report a use of force, in violation of their policy. Because of this failure to investigate, SLMPD did not identify or document the officers who assaulted Ms. Jones. *See e.g.* Def. Exh. K, Turner Dep. at 143:23-144:5.

77.     Sgt. Heather Taylor is the Senior Adviser to the St. Louis Public Safety Director, who oversees the St. Louis Metropolitan Police Department.  Prior to serving in this role, Sgt. Taylor spent nearly 20 years with SLMPD. *Id.* During her last six years on the force, she served as President of the St. Louis Branch of the Ethical Society of Police ("ESOP"). Exh. 27, Taylor

Dep. 36:19-38:4. She is now the Senior Advisor to the Director of Public Safety. Exh. 28, Taylor contact page from City of St. Louis website.

78.     Sgt. Taylor testified to the threatening and openly racist behavior of SLMPD Officer Mark West, and Defendant City's refusal to supervise or discipline him. Exh. 27, Taylor Dep. 11:6-12:3.

79.     In September 2021, now retired Officer West was arrested for molesting children. Exh. 29, Riverfront Times article about West.

80.     It was reported that as far back as 2017, multiple citizens had complained about Officer West to Defendant City with Defendant City taking no action. Exh. 29, Riverfront Times article about West.

81.     Sgt. Taylor also testified at length about the timeline of SLMPD officers beating undercover officer Luther Hall, and more specifically, the timeline of SLMPD leadership learning about their officers using excessive force against people they believed were protestors. Exh. 27, Taylor Dep. 35:19-41:20; 42:15-43:3.

82.     Officer Hall's beating took place on September 17, 2017, approximately two weeks *before* the incident at issue in this case. Exh. 27, Taylor Dep. 35:19-41:20; 42:15-43:3.

83.     SLMPD leadership, including the incident commander in this case had specific knowledge that their officers were inflicting physical punishment against civilians at least two hours before Plaintiffs were attacked and did nothing to stop it. Exh. 27, Taylor Dep. 36:11-38:4. SLMPD leadership took no action in the two weeks between Officer Hall's beating and the incident at issue in this case to reign in officers that they knew were violating the law by targeting protestors. *Id.*

84.     Sgt. Taylor also opined that the SLMPD Internal Affairs Division did not properly investigate police misconduct. Exh. 27, Taylor Dep. 35:19-36:10.

85.     Sgt. Taylor was also asked "Have you ever seen any of your colleagues at the department express bias against a person they perceived to be anti-police or anti-law enforcement?" Exh. 27, Taylor Dep 20:19-22:1.

86.     She then provided several pages of testimony about how SLMPD officers targeted her, the then Mayor of St. Louis, and protestors because the officer thought the individuals were "anti-police." Exh. 27, Taylor Dep. 20:19-22:1; 25:12-27:18.

87.     Sgt. Taylor also testified that she had observed livestreams of officers acting inappropriately toward protestors. Exh. 27, Taylor Dep. 30:18-31:3.

88.     She then testified about SLMPD officers who tried to speak up about rampant abuse of protestors without success. Exh. 38, Taylor Dep. 34:16-35:2.

89.     On May 19, 2015, in response to protests over the St. Louis Circuit Attorney's office's refusal to charge a SLMPD officer for killing an African American man, SLMPD officers deployed chemical agents against peaceful, non-criminal protestors without warning. PSOUF ¶ 93. *See* Exh. 30, Transcript of Testimony, Volume 1, *Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D. Mo. Oct. 18, 2017) ("Ahmad Tr.") at 69.

90.     On August 19, 2015, a protest occurred because SLMPD officers killed an African American man in the Fountain Park neighborhood. According to the testimony of Sarah Molina, a local attorney, SLMPD officers indiscriminately used chemical agents without giving an audible and intelligible warning at the intersection of Walton Avenue and Page Boulevard. *See* Exh. 30 at 69. Molina testified that SLMPD officers fired chemical agents at her without giving her an opportunity to leave. *Id*.

38

91.    SLMPD officers continued using chemical agents against people fleeing the area and even fired chemical agents at people peacefully standing on or in their own properties. *See* Exh. 30*, Ahmad Tr. at 50-52. Thirty minutes after the protests had dissipated, SLMPD officers returned and fired chemical agents at Ms. Molina, who was standing on property that she owns. *Id.*

92.    On July 21, 2017, SLMPD officers used chemical agents against people protesting the treatment of detainees in the St. Louis City Workhouse. *See* Exh. 30*, Ahmad Tr. at 71, 91. Although a few people did engage in unlawful activity earlier in the night, SLMPD officers pepper sprayed numerous people, none of whom were involved in criminal activity or were even at the same location as the criminal activity. *Id.* These protesters were engaged in non-violent protesting when SLMPD officers sprayed them with chemical agents. *Id.*

93.    In addition, SLMPD officers used chemical weapons and allegedly used excessive force on September 15, 16, 17, and 29 as detailed in at least 21 different lawsuits in this District.[3]

94.    The PFPC's 1986 Articles of Incorporation, state that the PFPC's purpose as "to implement a program which will assure the continuing provision of municipal and governmental services by various public facilities and functions in the St. Louis metropolitan area which facilities are placed in jeopardy by escalating costs and exposures to exceed fiscal abilities," alluding to creation of a self-insurance plan. Exh. 31, PFPC Articles of Incorporation.

---

[3]    *Burbidge v. St. Louis*, No. 4:17-cv-02482; *Faulk v. St. Louis*, No. 4:18-cv-00038; *Nelson v. St. Louis*, No. 4:18-cv-01561; *Baude v. St. Louis*, No. 4:18-cv-01564; *Dreith v. St. Louis*, No. 4:18-cv-01565, *Thomas v. St. Louis*, No. 4:18-cv-01566; *Laird v. St. Louis*, No. 4:18-cv-01567; *Rose v. St. Louis*, No. 4:18-cv-01568; *Alston v. St. Louis*, No. 4:18-cv-01569; *Robertson v. St. Louis*, No. 4:18-cv-01570; *Gullet v. St. Louis*, No. 4:18-cv-01571; *Newbold v. St. Louis*, No. 4:18-cv-01572; *Davis v. St. Louis*, No. 4:18-cv-01574; *Laney v. St. Louis*, No. 4:18-cv-01575; *Ortega v. St. Louis*, No. 4:18-cv-01576; *Ziegler v. St. Louis*, No. 4:18-cv-01577; *Green v. St. Louis*, No. 4:18-cv-01629; *Street v. St. Louis*, No. 4:19-cv-02590.

95.     The PFPC's bylaws restate the purposes recited in the Articles of Incorporation. Exh. 32, PFPC By-Laws at 1.

96.     The City's Board of Estimate and Apportionment's near-contemporaneous 1987 Resolution making clear that the PFPC "shall be responsible for the payment of *all claims*," and that "it is the intent to insure the city against *all claims for damages."* Exh. 33, City Risk Management Program Document at 1.

97.     The City has held out the PFPC as a self-insurance scheme to investors in order to finance municipal debt on numerous occasions, stating, for example, "[W]hen no independent insurance coverage exists, payments of settlements and judgments are administered by PFPC, *the city's self-insurance plan*." *See* The City of St. Louis, Missouri, General Obligation Refunding Bonds, Series 2016, A-53, https://bit.ly/2WTdjpR ("Series 2016 Bond"); *see also* The City of St. Louis, Missouri, General Obligation Bonds, Series 2016A, at A-51, https://bit.ly/2WTrJ9r ("Series 2016A Bond") (same); The City of St. Louis, Missouri, General Obligation Bonds, Series 2018, at A-52 ("Series 2018 Bond") https://bit.ly/2L3yMtw (same). *See also* 2016 Bond Issue, at A-32 ("[The City] uses a combination of third-party insurance *and self-insurance* for risk protection," and, "[e]ach year[,] an appropriation is made to a judgment account, which is segregated and reserved for a nonprofit corporation, *[the] . . . PFPC[], from which all judgments or settlements are paid*.") (emphasis added); 2016A Bond Issue, at A32 (same); 2018 Bond Issue, at A-32 (same).

98.     Specifically, *"[t]he Law Department prepares vouchers for such payments, which are submitted to the Comptroller's office and drawn on PFPC's account"*—just as the City's Charter contemplates. *See* Series 2016 Bond, at A-53 (emphasis added); Series 2016A Bond, at A-51 (same); Series 2018 Bond, at A-52 (same).

99.     Resolution #88.095, adopted by the Board of Estimate and Apportionment, states: "All accounts shall be paid by voucher of PFPC, charged to the Fund, certified by signature of an officer of said corporation and drawn by the Comptroller on the Treasurer." Exh. 33 at 2.

100.    The City has repeatedly paid tort claim judgments from the PFPC, a fund the City itself characterizes as a self-insurance scheme. *See, e.g.,* The City of St. Louis, Missouri, 2% Tax and Revenue and Anticipation Notes, Series 2015, at A-52, https://bit.ly/2WT0Sud ("2015 2% Tax and Revenue Bond") (discussing *Wann v. The City of St. Louis*, a class action bringing tort claims, and noting that, "City's exposure is approximately $2.87 million"); *Wann v. City of St. Louis,* No. 1422-CC10272, Order of Final Approval of Class Settlement, at ¶ 5 (July 18, 2016) (ultimately approving settlement fund of $1,750,420); *see also* The City of St. Louis, Missouri, 2% Tax and Revenue and Anticipation Notes, Series 2016, at A-54 https://bit.ly/2L8IrPK ("2016 2% Tax and Revenue Bond") (discussing *Bonenberger v. St. Louis Metropolitan Police Department*, No. 4:16-cv-00788-PLC (E.D. Mo.), a federal suit bringing MRHA and Section 1983 claims resulting in cumulative $620,000 damages award, affirmed on appeal, and "paid in full," with *"[t]he City pa[ying] its portion of the judgment out of its self-insurance program*," *i.e.* the PFPC) (emphasis added).

101.    The City's 2016 and 2017 Comprehensive Annual Financial Reports ("CAFR")[4] likewise characterize the "PFPC [a]s an internal service fund," with "its sole purpose is to provide the City with a defined and funded *self-insurance program for claims, judgments, and other related legal matters*." *See* FY2016 CAFR, at 32, https://bit.ly/3herFKW (emphasis added); *id.* at 36-37 ("[The] PFPC fund is *used to account for payment of . . . various . . . claims against legal*

---

[4]     These CAFRs are judicially noticeable as the publicly available records of a governmental entity. *See* Fed. R. Evid. 201.

*actions on behalf of other funds*") (emphasis added); *id.* at 133-34, 136-37 (detailing figures); *see also* FY2017 CAFR, at 34, 38, 134-35, 137-38, https://bit.ly/3roIWFQ (same).

102.    On January 31, 2018, City Counselor Julian Bush sent an opinion letter to Alderwoman Megan E. Green that stated "the PFPC . . . *can be properly thought to be self-insurance.*" *See* Exh. 34 (emphasis added).

103.    The PFPC was created in 1986 by then-St. Louis Budget Director Stephen P. Mullin; then-Deputy Comptroller John Zakibe, and then-City Counselor Thomas J. Ray, pursuant to 26 U.S.C. § 501(c)(3), in order "to implement a program which w[ould] assure the continuing provision of municipal and governmental services by various public facilities and functions in the St. Louis metropolitan area which facilities are placed in jeopardy by escalating costs and exposures to exceed fiscal abilities." Exh. 31 at 1.

104.    "[T]he PFPC has permitted City agencies and related public entities within the City of St. Louis *to participate in PFPC's Indemnification Fund*." Exh. 35 at 2 (emphasis added).

105.    The Indemnification Fund "is a fund used to pay for settlements and judgments rendered against the City and City employees." Exh. 36 Jones at 1.

106.    The City participates by "transfer[ing] funds yearly to PFPC through the law enforcement budget, as well as other budgets," which the "PFPC then uses the transferred funds to pay judgments against the City and its employees generally." Exh. 36 Jones at 1 (citations omitted).

107.    In *Hendrix v. City of St. Louis*, the City even conceded that any judgment on the plaintiff's assault and battery claims would be paid from the PFPC. Exh. 37 at 8.

108.    The PFPC pays out settlements regardless of the nature of the underlying cases. Exh. 38, Garvin 30(b)(6) Dep. 26:10-27: 2, 27:15-23, 61:2-5, 62:3-8, 63:11-64:3.

109.    There are no particularized funds within the PFPC, so all monies paid from the PFPC come from the same account, regardless of the nature of the claim. Exh. 38, Garvin 30(b)(6) Dep. 59:6-18.

110.    Since the creation of the PFPC, the City has never paid out a settlement or judgment from anything other than the PFPC. Exh. 38, Garvin 30(b)(6) Dep. 65:2-14.

111.    When asked what role the PFPC has in police officer indemnification, Garvin stated "If a police officer -- if a claim is made against a police officer for something that happened during a course and scope of his employment, the City generally will cover *any settlement or judgment pertaining to the police officer*." Exh. 38, Garvin 30(b)(6) Dep. 56:20-57:2, 65:25-66:21 (emphasis added).

**Identifying Parties in Videos**

112.    In order to identify the Defendants in the Bryant Photographs, Plaintiff produces as Exhibits 39 and 40. Defendants produced these in discovery as Jones 1040 Labelled and Jones 1053 Labelled, respectively.

113.    Exhibit 39 is an annotated version of Plaintiff's Exh. 3, Bryant Photo No. 3-9. Plaintiff notes that she edited Exhibit 39 to include the caption "John Doe No. 2," which did not appear in the City's version.



114.    Exhibit 40 is an annotated version of Plaintiff's Exh. 3, Bryant Photo No. 3-22.



115.    In order to identify the Defendants in Exhibit S, Defendant attaches Exh. 41 which

is a screenshot identifying Defendants Turner, Vanarsdale, and John Doe No. 2.



116.    This screenshot is from the deposition of Charles Wall, who was designated by the

City as a 30(b)(6) witness. Wall identified the Defendant DeMattias in Exh. 42 (formerly Wall

Dep. Exh. 21), identified at Exh. 43, Wall Dep. 30:11-22.



Date: January 13, 2022                      Respectfully submitted,

KHAZAELI WYRSCH LLC

/s/ Javad M. Khazaeli
James R. Wyrsch, #53197(MO)
Javad M. Khazaeli, #53735(MO)
Khazaeli Wyrsch, LLC
911 Washington Avenue, Suite 211
St. Louis, MO 63101
(314) 288-0777
james.wyrsch@kwlawstl.com
javad.khazaeli@kwlawstl.com

*Attorneys for Plaintiff*