UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| LAURA JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.  4:19-cv-02583 |
| | ) | |
| CITY OF ST. LOUIS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

Plaintiff Laura Jones alleges that she was injured by officers of the St. Louis Metropolitan Police Department ("SLMPD") while attending a protest in downtown St. Louis.  She has sued City of St. Louis (the "City") and SLMPD officers Timothy Turner, Jonathan Vanarsdale, Brian DeMatteis, Joshua Hall, and unidentified John Does 1 and 2,[1] asserting claims under 42 U.S.C. § 1983 and state law.  The matter is now before the Court on the named Defendants' motion for summary judgment.  ECF No. 63.

For the reasons set forth below, Defendants' motion will be granted in part and denied in part.  The motion will be granted with respect to Plaintiff's claims for violation of her First Amendment rights and for municipal liability under  § 1983, but the motion will be otherwise denied.  Further, the Court will decline to exercise supplemental jurisdiction over Plaintiff's state-law claims against the City and will dismiss those

---

[1]  The parties stipulated to the dismissal of five additional named Defendants: Samuel Gilman, Joe Lankford, Elijah Simpson, Sisavath Singharath, and Richard Hellmeier.  *See* ECF Nos. 81 & 82.

claims without prejudice.  Finally, the Court will order Plaintiff to show cause why the Doe Defendants should not be dismissed.

## BACKGROUND

### Downtown Protests

Viewed in the light most favorable to Plaintiff, the facts are as follows.  On September 15, 2017, SLMPD Officer Jason Stockley was acquitted of the murder of St. Louis resident Anthony Lamar Smith.  ECF No. 75, Pl.'s Resp. to Defs.' Statement of Uncontroverted Material Facts ("SUMF") ¶ 1.  In response to the acquittal, many people gathered in downtown St. Louis that day to protest.  SUMF ¶ 2.

The record contains extensive video and photographic evidence of the downtown protest, including cell phone videos, SLMPD documentary team videos, aerial and on-the-ground videos from media outlets, surveillance videos from fixed cameras, and still photographs, all from different angles.  The parties have also added captions and other annotations to some of the video and photographic evidence.

At approximately 1:30 PM on September 15, 2017, before Plaintiff arrived downtown, the SLMPD was in the process of loading officers onto buses in order to remove them from the downtown area where protests were occurring.  SUMF ¶ 4.  In response, some protestors formed a wall in an attempt to prevent the buses from leaving, and a few protestors threw items, such as water bottles, at the buses.  SUMF ¶¶ 6–11.  The SLMPD deployed a Bicycle Response Team (BRT) to help extract the buses, and the buses thereafter left the area.  SUMF ¶¶ 13–15

More than three hours later, around approximately 5:00 p.m., Plaintiff arrived

downtown and joined a crowd protestors near the intersection of Clark Avenue and Tucker Boulevard.   Hundreds of individuals were assembled or milling around at or near this intersection.   Around this time, a couple of individuals jumped on and kicked the windshield of a vacant police vehicle parked on Clark, just west of the intersection with Tucker, before running away.   SUMF ¶ 15; *see also* ECF No. 75-2, Pl.'s Ex. 2, at 47. The SLMPD sent Special Operations officers and BRT officers to the intersection to respond, but a few individuals out of the hundreds in the crowd began throwing items at these officers.   SUMF ¶¶ 16–20.   The SLMPD then determined it necessary to dispatch the Civil Disobedience Team (CDT) to the intersection.   SUMF ¶ 21.

Shortly thereafter, the CDT officers formed a line on Clark, facing west toward its interaction with Tucker, where a crowd of protestors, including Plaintiff, was gathered. The line of CDT officers held up shields in front of them.   Plaintiff moved to the front of the crowd and stood in front of the CDT line with her arms outstretched above her head and made "peace signs" with each hand.   She was surrounded by several other protestors. Meanwhile, a handful of individuals approximately 50 feet behind Plaintiff, near the northwest corner of Clark and Tucker, continued to throw water bottles and also began to throw pieces of concrete from a broken manhole cover at the officers.   The broken manhole cover was located on Tucker Boulevard, just north of the intersection with Clark.   Plaintiff was not throwing any objects, and from the video footage, it does not appear that anyone immediately surrounding her was either.   However, concrete and water bottles can be seen flying overhead toward the CDT line from the Clark and Tucker intersection behind Plaintiff.

3

According to video and other evidence, the following events then transpired very quickly, within the span of several seconds.  The CDT line advanced forward toward Plaintiff while an SLMPD sergeant not named in this action, Brian Rossomanno, began shouting over a loudspeaker.  *See* ECF No. 15, Defs.' Ex. R, at 1:28.  Plaintiff heard the police announce something over a loudspeaker, but she could not determine what was said.  SUMF ¶ 44.  However, video evidence confirms that Sergeant Rossomanno was beginning to announce what would be his first dispersal order.  *See* ECF No. 66-14, Defs.' Ex. Q, at 31:34.

The remaining named Defendant officers were among the officers near the front of the CDT line.  They assert that they were instructed to move toward the protestors in order to occupy the portion of the intersection where the broken manhole cover was located.  SUMF ¶ 31.

As Plaintiff focused on discerning the message from the loudspeaker, an unidentified police officer (John Doe No. 1 in Plaintiff's lawsuit) suddenly sprayed Plaintiff in the eyes with pepper spray while the line of CDT officers continued to advance.  Almost immediately after Plaintiff was sprayed, and while Plaintiff was temporarily blinded from the pepper spray, the moving line of CDT officers reached and made physical contact with Plaintiff.  Plaintiff screamed as these events took place.

The timing of Sergeant Rossomanno's first dispersal order and officers' use of pepper spray and other force on Plaintiff is somewhat unclear from the video evidence. In one video, Sgt. Rossomanno can be heard beginning to announce an order at about 8:47.  ECF No. 66-7. Defs.' Ex. H, at 8:47.  Seconds later, Plaintiff can be heard

4

screaming.  *Id.* at 8:50.  By the time the dispersal order is completed at about 9:03,

Plaintiff can be seen lying motionless on the ground beneath the advancing officers.

Video evidence from other angles suggests that the dispersal order began after the

officers advanced, and the order was not completed until Plaintiff was already on the

ground.  *See* ECF No. 66-14, Defs.' Ex. Q, at 31:39; ECF No. 66-6, Defs.' Ex. G, at 8:19;

ECF No. 66-15, Defs.' Ex. R, at 1:34.

The nature of the officers' contact with Plaintiff is also in dispute.  According to

Plaintiff, Vanarsdale pushed or shoved Plaintiff backward with his shield, and Turner

used his left arm to push Plaintiff onto the ground.  SUMF ¶¶ 48–52.  Plaintiff then

curled herself into a fetal position on the ground to avoid being injured by the other

officers.  ECF No. 86, Defs.' Resp. to Pl.'s Additional Statement of Uncontroverted

Material Facts ("ASUMF") ¶ 18.

Another protestor attempted to aid Plaintiff while she lay on the pavement, but

DeMatteis rushed forward and pressed Plaintiff against the ground with his shield, which

prevented the other protestors from reaching her.  While Plaintiff remained on the

ground, DeMatteis then kicked or struck Plaintiff as he pressed forward toward other

fleeing protestors.[2]  SUMF ¶ 53.  As the rest of the CDT line advanced, Hall also kicked

or struck plaintiff with his foot as he stepped over her body.  SUMF ¶ 53.

After the CDT line passed Plaintiff, other officers pulled her to her feet, restrained

---

[2]     Video evidence depicts a young woman near Plaintiff being pushed to the ground
by the advancing officers immediately after Plaintiff was knocked down, and a non-
defendant officer appears to kick the other protestor while she lay on the ground.   ECF
No. 66-16, Defs.' Ex. S, at 0:10.

her hands, placed her in handcuffs, and then led her away from the protest.[3]  SUMF ¶¶

54–57.  Some other protestors who failed to move away from the CDT officers were also

arrested, but most of the protestors were permitted to leave the area.  SUMF ¶ 58.

Plaintiff was arrested for interfering with law enforcement, but no formal charges were

ever filed against her.  SUMF ¶¶ 57, 63.

Turner testified by deposition that Plaintiff was arrested for interfering with police

because she refused to disperse after orders were given to disperse.  ECF No. 66-9, Defs.'

Ex. K, Turner dep. at 83:19-84:4.  Plaintiff suffered extensive bruising and an asthma

attack as a result of the CDT officers' use of force.  She also suffered psychological

trauma from the encounter.

**City Policies, Practices, and Training**

The City has instituted a variety of policies and procedures to regulate the use of

force by officers.  The City has a written use-of-force policy which requires the

Department of Personnel, Police Division, to identify all incidents involving the use of

force by officers.  The policy requires all officers to document the use of force, and these

use of force reports are reviewed by supervisors.  If supervisory officers believe the use

of force was excessive or unwarranted, they can investigate further or initiate disciplinary

proceedings.  Further, the SLPMD maintains an Internal Affairs Division which

investigates some civilian complaints against officers.

The use-of-force policy also includes regulations which apply to "mass civil

---

[3]      The arresting officer was Defendant Simpson, who, as noted above, has since been
voluntarily dismissed by stipulation.

disobedience contexts," and which specifically regulate the deployment of chemical agents for crowd dispersal.  The latter regulations were added to the SLMPD's use-of-force policy pursuant to a settlement agreement in *Templeton v. Dotson*, No. 4:14CV2019 CEJ (E.D. Mo.), entered on March 25, 2015.  That settlement agreement prohibited the SLMPD from deploying chemical agents for the purpose of dispersing individuals engaged in non-criminal activity unless officers (a) issue a clear and unambiguous warning, (b) provide individuals sufficient opportunity to heed the warning, (c) reasonably attempt to minimize the impact of the chemical agents on individuals who are complying with lawful law enforcement commands, and (d) ensure there is a means of safe egress from the area.  *See* ECF No. 75-6, Pl.'s Ex. 6, *Templeton* Settlement Agreement.  Per the settlement agreement, these restrictions do not apply "to situations that turn violent and persons at the scene present an imminent threat of bodily harm to persons or damage to property, and when law enforcement officials must defend themselves or other persons or property against such imminent threat."  *Id.*

SLMPD officers also receive ongoing training regarding the use of force.  Each officer must complete a defensive tactics course at the Police Academy, and officers are tested monthly on the use-of-force policy through an internal Policy Acknowledgement System ("PASS").  SUMF ¶¶ 67–68.  All SLMPD officers were also sent a copy of the *Templeton* settlement and were required to confirm that they read the order.  SUMF ¶ 73.  In anticipation of protests that were expected to follow from the *Stockley* verdict, supervising officers received special training with the Police Legal Division.

Although all SLMPD officers were required to verify that they had read the

7

*Templeton* agreement, a substantial number of deposed officers, including Defendant Vanarsdale, testified that they had no awareness of this agreement and could not recall if they had received training on its requirements.  ASUMF ¶¶ 58–60.  High-ranking supervisors in the SLMPD were similarly unfamiliar with the settlement's terms and could not recall training with respect to it.  ASUMF ¶¶ 62–68.

SLMPD policy also requires that officers document the use of force for supervisory review.  The officers named in this lawsuit did not document any use of force against Plaintiff during this incident.  Instead, the incident report indicates that Plaintiff "tripped and fell to the ground," and it does not mention the use of force or pepper spray against Plaintiff.  ECF No. 75-2, Pl.'s Ex. 2, at 48.

Beyond the events at issue here, Plaintiff has provided evidence of other protests against police violence or misconduct, and the SLMPD's response thereto.  Specifically, Plaintiff has attached excerpts of the transcript of an October 2018 preliminary injunction hearing before Judge Catherine D. Perry in *Ahmad v. City of St. Louis*, No. 4:17 CV 2455 CDP (E.D. Mo.), another case arising out of the *Stockley* protests.  The excerpts contain witness testimony briefly describing or alluding to the SLMPD's prior use of chemical agents without warning against people protesting police killings on two occasions, in May and August of 2015, and against people protesting the treatment of detainees in the St. Louis City Workhouse on July 21, 2017.  *See* ASUMF ¶¶ 89–92.

**Public Facilities Protection Corporation**

In 1986, the City's Budget Director, Deputy Comptroller, and City Counselor formed a Missouri corporation called the Public Facilities Protection Corporation

(PFPC).  The PFPC is a common fund which exists to provide liability protection to the
City, and the City transfers funds annually to the PFPC.

**Procedural History**

Plaintiff alleged ten claims in her amended complaint (ECF No. 39): Count I
against the individual Defendants for violating her First Amendment rights under 42
U.S.C. § 1983; Count II against the City for municipal liability under § 1983; Count III
against the individual Defendants and the City for negligent infliction of emotional
distress under state law; Count IV against the individual Defendants for excessive force
in violation of the Fourth Amendment under § 1983; Count V against the individual
Defendants and the City for battery under state law; Count VI against the individual
Defendants for unreasonable seizure in violation of the Fourth Amendment; and Counts
VII through X against the individual Defendants and the City for false arrest, false
imprisonment, abuse of process, and malicious prosecution under state law.

By stipulation of the parties (ECF No. 81), the claims directly challenging
Plaintiff's arrest—Counts VI (unreasonable seizure), VII (false arrest), VIII (false
imprisonment), IX (abuse of process), and X (malicious prosecution)—were dismissed
with prejudice.  Thus, the only remaining claims are for First Amendment retaliation,
excessive force, municipal liability, negligent infliction of emotional distress, and battery.

The Court previously granted Plaintiff additional time to complete discovery in
order to attempt to identify the remaining John Doe defendants and compelled the City to
assist Plaintiff in those efforts.  *See* ECF No. 62.  Discovery is now complete, and the
case is ready for trial.  However, Plaintiff has still not identified John Doe Nos. 1 and 2.

## ARGUMENTS OF THE PARTIES

The remaining named Defendant officers argue that they are entitled to summary judgment because the federal claims against them are barred by qualified immunity and the state-law claims against them are barred by official immunity. The City argues that it is entitled to summary judgment on Plaintiff's municipal liability claim because there is no underlying constitutional violation and, even if there were, Plaintiff has failed to offer evidence of a City policy, custom, or practice that caused such a violation. The City further argues that the state-law claims against it are barred by sovereign immunity.

In response, Plaintiff argues there are genuine issues of material fact with respect to both the First Amendment and excessive force claims against the officers, and Plaintiff contends that it may be reasonably determined from the evidence that the officers violated Plaintiff's clearly established constitutional rights. On the state-law claims against the officers, Plaintiff argues that the evidence reasonably gives rise to a finding of bad faith or malice, such that official immunity is not warranted.

With respect to the City, Plaintiff argues that the evidence creates genuine disputes of material fact as to whether the City failed to train and supervise its officers, and as to whether the City had a custom of permitting officers to use excessive force. Finally, Plaintiff argues that the City has waived sovereign immunity by virtue of the PFPC.

## DISCUSSION

### I.    Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

10

Fed. R. Civ. P. 56(a).  "[T]he burden of demonstrating there are no genuine issues of

material fact rests on the moving party, and we review the evidence and the inferences

which reasonably may be drawn from the evidence in the light most favorable to the

nonmoving party." *Allard v. Baldwin*, 779 F.3d 768, 771 (8th Cir. 2015).  To avoid

summary judgment, the nonmovant has the "burden of presenting evidence sufficiently

supporting the disputed material facts that a reasonable jury could return a verdict in their

favor." *Gregory v. City of Rogers, Ark.*, 974 F.2d 1006, 1010 (8th Cir. 1992).  "Where

the record taken as a whole could not lead a rational trier of fact to find for the

nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Industrial Co. v.

Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

## II.   **Photographic and Video Evidence**

Both parties rely heavily on the photographic and video evidence from the day of

the protest.  While some of the still photographs provide high-resolution captures of the

events between Plaintiff and the CDT officers, several of the video clips do not include

the full sequence of events involving Plaintiff.  Additionally, some of the videos have no

audio.  Each side contends that the photographic and video evidence contradicts the other

side's version of events and confirms its own.   Defendants also invoke *Scott v. Harris*,

550 U.S. 372 (2007), and argue that the photographic and video evidence "blatantly

contradict" Plaintiff's assertions.  However, with respect to several disputed questions of

fact, the Court cannot say that the photographic and video evidence conclusively

establishes the true version of events.

For example, Defendants assert that the video evidence proves that law

11

enforcement issued dispersal orders prior to making physical contact with Plaintiff. However, as noted above, several videos from the incident show that the first dispersal order was given shortly after, at about the same time, or, at best, a moment before, the CDT line's advance, and the order was not completed until Plaintiff was on the ground.

Defendants also contend that Turner and Vanarsdale "likely made contact" with Plaintiff but that this contact was "incidental" and "inevitable." Again, the video evidence does not incontrovertibly support Defendants' characterization of events. The aerial view of Plaintiff's arrest shows Vanarsdale appearing to push or shove Plaintiff backward with his shield, causing her to fall to the ground. ECF No. 66-16, Defs.' Ex. S, at 0:02. Turner's contact with Plaintiff is difficult to evaluate from the video, but it cannot be said that the footage "conspicuously refutes and completely discredits" Plaintiff's version of events. *Wallingford v. Olson*, 592 F.3d 888, 893 (8th Cir. 2010). Photographic evidence could reasonably support Plaintiff's version that Turner held Plaintiff by her arm and prevented her from moving away from the advancing CDT line. ECF No. 66-27, Defs.' Ex. EE, at 11, 15–16.

Defendants further contend that the contact between DeMatteis and Plaintiff was "inadvertent." This assertion is likewise not incontestably supported by the video evidence. The aerial video appears to show DeMatteis rush forward to push another protestor away from Plaintiff after Plaintiff is lying on the ground. The relevant portion of the video is obscured by a passing helicopter, but DeMatteis can be seen pressing his shield against Plaintiff while she is on the ground. The video also shows DeMatteis hit Plaintiff with his left leg as he steps over her. ECF No. 66-16, Defs.' Ex. S, at 0:06. This

12

video evidence does not blatantly contradict Plaintiff's version of events, and several portions of the footage appear to support Plaintiff's characterization of events.

The video evidence with respect to Hall is less decisive.  The aerial video shows Hall's right leg make contact with Plaintiff while Hall steps over Plaintiff, but it is unclear if this contact is accidental or deliberate.  ECF No. 66-16, Defs.' Ex. S, at 0:08. Furthermore, whether Hall contacts Plaintiff with his other leg cannot be determined from the video because he is blocked by another protestor.  The photographs of Hall also do not conclusively demonstrate whether his contact with Plaintiff was intentional; nor do they demonstrate the force with which Hall's leg struck Plaintiff.  Although the photographic and video evidence does not overwhelmingly support Plaintiff's assertions with respect to Hall, it does not completely discredit them either.

## III.  **Claims Against Individual Officers**

The Court first addresses the federal claims against the remaining named officers for retaliation in violation of the First Amendment (Count I) and excessive force in violation of the Fourth Amendment (Count IV), as well as the state-law claims against these officers for negligent infliction of emotional distress (Count III) and battery (Count V).  The Court concludes that the Defendant officers are entitled to qualified immunity on Count I but that genuine disputes of material fact preclude a grant of qualified immunity on Count IV or official immunity on Counts IIII and V.

### A.  **Qualified Immunity on Federal Claims (Counts I and IV)**

"Qualified immunity shields government officials from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right

13

of which a reasonable person would have known." *Burbridge v. City of St. Louis*, 2 F.4th 774, 780 (8th Cir. 2021). "Once a defense of qualified immunity is raised, a plaintiff must offer 'particularized' allegations of unconstitutional or illegal conduct." *Conrod v. Davis*, 120 F.3d 92, 95 (8th Cir. 1997). "The doctrine of qualified immunity requires an individualized analysis as to each officer, because a person may be held personally liable for a constitutional violation only if his own conduct violated a clearly established constitutional right." *Manning v. Cotton*, 862 F.3d 663, 668 (8th Cir. 2017) (citations, internal quotation marks, and emphasis omitted). The Supreme Court has emphasized that "qualified immunity represents the norm," *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982), and its protections extend to "all but the plainly incompetent or those who knowingly violate the law," *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002). In determining whether a constitutional violation is established, the Court is obligated to "view the evidence in the light most favorable to the opposing party." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

Even if the action in question does violate a constitutional right, to overcome qualified immunity, it must also be shown that the violated right was clearly established. For a constitutional right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). There is no requirement that "the very action in question has previously been held unlawful," but for

14

an official action to violate a clearly established right, the unlawfulness of that action must be apparent in light of pre-existing law. *Id.* "In other words, the right violated must have been established 'beyond debate.'" *Mendoza v. United States Immigr. & Customs Enf't*, 849 F.3d 408, 417 (8th Cir. 2017) (citation omitted). Clearly established law "should not be defined at a high level of generality," but instead "must be particularized to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam).

### 1.  First Amendment Claim (Count I)

The First Amendment generally forbids government officials from retaliating against an individual for their First Amendment activity, and a violation of this right can support a claim under 42 U.S.C. § 1983. *See Hartman v. Moore*, 547 U.S. 250, 255–56 (2006). To establish such a claim, "the plaintiff must show (1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014).

While retaliation need not be the only motivator, it must be "a substantial factor in the decision to arrest." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010). It is the plaintiff's burden to show the retaliatory motive was a "substantial factor" or a "but-for" cause of the arrest. *Id.* "The causal connection is generally a jury question, but it can provide a basis for summary judgment when the question is so free from doubt as to justify taking it from the jury." *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004) (citation omitted). "If the [adverse action] was driven not by 'animus' but

15

by the defendant's understanding—however mistaken—of his official duties, then it was not 'retaliatory.'" *Mitchell v. Kirchmeier*, 28 F.4th 888, 896 (8th Cir. 2022).

In this case, Plaintiff's First Amendment claim is deficient because she has not produced sufficient evidence to show that retaliation was a "substantial factor" which motivated the named officers' conduct.[4]  There is no evidence that the named officers targeted Plaintiff specifically because she was engaged in expressive activity at the protest; indeed, the majority of protestors in downtown St. Louis on the day in question were not arrested for their expressive activity.  *Cf. Peterson*, 754 F.3d at 603 (denying summary judgment for First Amendment retaliation claim where the victim of adverse action was the only person engaged in First Amendment expression).  Instead, the evidence tends to support the alternative explanation that the officers targeted Plaintiff because she interfered with the advance of the CDT line.  *See Mitchell*, 28 F.4th at 897–98 (holding that retaliatory animus had not been plausibly alleged where the protestor-plaintiff was injured by law enforcement "after [he] stood in their way and ignored a [warning to disperse]").  Furthermore, the fact that the CDT officers were being pelted with water bottles and pieces of concrete bolsters Defendants' non-retaliatory justification that any use of force was in an attempt to maintain order.

---

[4]     The Court expresses no opinion on whether John Doe No. 1's use of pepper spray constituted unlawful retaliation.  This officer has not been identified, and none of the named Defendant officers is alleged to have participated in the use of pepper spray against Plaintiff.  Qualified immunity requires an individualized analysis for each defendant, and the conduct of a nonparty officer is irrelevant to the issue of whether the remaining named Defendants here violated Plaintiff's First Amendment rights.  *See Manning v. Cotton*, 862 F.3d 663, 668 (8th Cir. 2017).

As discussed below, the evidence here—particularly regarding whether Plaintiff was given a warning to disperse before officers used force against her and the nature of the force used—gives rise to a questions of fact that warrant a denial of qualified immunity on Plaintiff's excessive force claim.[5]  However, "[o]fficers merely carrying out their duty as they understand it are not liable for retaliatory arrest or retaliatory use of force even if their understanding of their duty is . . . so mistaken as to be 'unreasonable.'" *Id.* at 897.  On this record, Plaintiff has not presented evidence which from which it could be reasonably concluded that she was "'singled out' for adverse treatment because of [her] exercise of constitutional rights." *Kilpatrick v. King*, 499 F.3d 759, 767 (8th Cir. 2007) (quoting *Osborne v. Grussing*, 477 F.3d 1002, 1006 (8th Cir. 2007)).  At a minimum, Plaintiff cannot show that the law was clearly established that advancing the CDT line under these circumstances would have been a violation of the First Amendment.  Therefore, the remaining named Defendant officers are entitled to qualified immunity on Count I.

## 2.  Excessive Force / Fourth Amendment Claim (Count IV)

The Fourth Amendment protects the right of individuals to be free from excessive force in the context of an arrest, and violations of this right are cognizable under § 1983. *See Graham v. Connor*, 490 U.S. 386, 393–94 (1989).  "Excessive force claims under the Fourth Amendment are governed by a reasonableness standard." *White v. Jackson*, 865 F.3d 1064, 1074 (8th Cir. 2017).  In analyzing whether the use of force in a particular

---

[5]      As noted above, the parties stipulated to the dismissal of Plaintiff's unlawful arrest claim (Count VI). *See* ECF No. 81.

case is reasonable, the Court engages in "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (quoting *Graham*, 490 U.S. at 396). Relevant factors to consider include (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

This assessment is an objective one, and it considers reasonableness "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018). Further, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* (citing *Graham*, 490 U.S. at 396-397).

Viewed in the light most favorable to the Plaintiff, the evidence indicates that the remaining named Defendant officers violated Plaintiff's clearly established right to be free from excessive force. These officers do not contend that they believed Plaintiff was acting as a unit with the individuals who were throwing objects at them or that Plaintiff otherwise presented any immediate threat. *Cf. Bernini v. City of St. Paul*, 665 F.3d 997, 1005–06 (8th Cir. 2012). Yet, according to Plaintiff, Defendants Vanarsdale and Turner both pushed Plaintiff to the ground. Based on the video evidence, this use of force may have occurred either before or simultaneous with the first order to disperse, and there are

18

genuine disputes of material fact as to whether officers gave any warning prior to advancing and whether and to what degree Plaintiff was noncompliant. *See Ngo v. Storlie*, 495 F.3d 597, 603 (8th Cir. 2007) (noting that failure to give a warning where feasible may "add[] to the unreasonableness" of an officer's actions); *MacKintrush v. Pulaski Cty. Sheriff's Dep't*, 987 F.3d 767, 770 (8th Cir. 2021) (holding that a question of fact as to the existence and extent of an individual's noncompliance with officer's commands prior to the officer's use of force precluded grant of qualified immunity).

Once Plaintiff had fallen to the ground, Defendant DeMatteis pressed Plaintiff into the ground with his shield, even after she had fallen over and did not pose a threat to the officers. Defendants Hall and DeMatteis also kicked  or struck Plaintiff with their feet as they advanced down the street. Each of the Defendant officers used force against Plaintiff, even though she was suspected of, at most, only a nonviolent misdemeanor, she posed no threat to officers, and she was not resisting in any way. *See MacKintrush*, 987 F.3d at 771 (8th Cir. 2021) ("Ambiguous gestures that officers claim are noncompliant . . . do not justify body slamming an otherwise compliant, nonviolent, nonthreatening misdemeanant."); *cf. White*, 865 F.3d at 1079–80 (granting qualified immunity to officers for shooting a protestor with rubber bullets when he was in the vicinity of a violent crowd and proceeded directly toward a police skirmish line after being told to stop approaching the line, but denying qualified immunity to officers for pepper spraying, punching, and kicking that protestor after he was fully subdued and no longer resisting).

Defendants contest Plaintiff's characterization of the facts, and they suggest that the Defendant officers only "made inadvertent contact" with Plaintiff and caused, at

most, only de minimis injury.[6]  But Defendants' disagreement regarding the intentionality of their physical contacts demonstrates a genuine dispute of material fact.

The video evidence does not completely discredit Plaintiff's version of events, and the Court is obligated to view the evidence in the light most favorable to Plaintiff.  So viewed, a reasonable jury could conclude that the level of force used by each officer was unreasonable.  *See, e.g.*, *Smith v. Stoneburner*, 716 F.3d 926, 934 (6th Cir. 2013) (finding a factual issue as to whether an officer's collision with the plaintiff's mother was an inadvertent bump or whether the officer gratuitously shoved the mother against the house, and holding that this factual issue "ma[de] a difference" with respect to the mother's excessive-force claim).

Likewise, the Court cannot say as a matter of law that the officers' use of force, resulting in extensive bruising and other injuries to Plaintiff, was de minimis.  *See Small v. McCrystal*, 708 F.3d 997, 1005 (8th Cir. 2013) (holding that tackling that resulted in cuts on an individual's face that did not require stitches was more than de minimis force); *Burbridge*, 2 F.4th at 781 (where the court was unable to clearly see from video evidence that an officer's involvement was limited to kneeling on a protestor's legs, the court could not say that the officer's use of force was de minimis as a matter of law).

Additionally, the constitutional rights at issue in this case were clearly established. On this prong, Plaintiff's burden is not to "show that the very action in question has

---

[6]     "Accidental force" does not qualify as a seizure under the Fourth Amendment. *See Torres v. Madrid*, 141 S. Ct. 989, 998 (2021).  However, Defendants do not dispute that a seizure took place here, and Plaintiff was in fact subsequently arrested.

previously been held unlawful," but only to show "that the unlawfulness was apparent in light of preexisting law." *Ellison v. Lesher*, 796 F.3d 910, 914 (8th Cir. 2015) (citation and internal quotation marks omitted).

Under Eighth Circuit precedent, it was "clearly established" at the time of the events here that the "gratuitous" use of force "against a suspect who is handcuffed, not resisting, and fully subdued [was] objectively unreasonable under the Fourth Amendment." *Krout v. Goemmer*, 583 F.3d 557, 566 (8th Cir. 2009); *see also Small*, 708 F.3d at 1005 (holding that it was a clearly established violation of Fourth Amendment rights to run toward and tackle an individual from behind without warning, when the individual was charged with a nonviolent misdemeanor and was not an immediate threat, in flight, or resisting arrest); *Mitchell*, 28 F.4th at 898 ("[W]e have held time and again that, if a person is not suspected of a serious crime, is not threatening anyone, and is neither fleeing nor resisting arrest, then it is unreasonable for an officer to use more than de minimis force against him."). Controlling precedent similarly indicates that unlawfulness is clearly established where law enforcement agents "strike a nonviolent person who had committed no crime, who was not fleeing or resisting arrest, [and] who posed little to no threat to anyone's safety . . . ." *Burnikel v. Fong*, 886 F.3d 706, 712 (8th Cir. 2018).

A reasonable jury could conclude from the evidence that the named officers pushed Plaintiff to the ground, crushed her with a shield, and kicked her on the ground, after she had been pepper sprayed without warning and while she posed no threat or resistance. A reasonable officer would have understood that these actions would violate

clearly established constitutional rights.   Accordingly, the remaining named Defendant officers are not entitled to qualified immunity on Count IV.

### B.  Official Immunity for State-Law Claims (Counts III and V)

"The doctrine of official immunity 'protects public employees from liability for alleged acts of negligence committed during the course of their official duties for the performance of discretionary acts.'" *Wealot v. Brooks*, 865 F.3d 1119, 1129 (8th Cir. 2017) (quoting *Southers v. City of Farmington*, 263 S.W.3d 603, 610 (Mo. 2008)).  In Missouri, the general rule is that "official immunity applies to all discretionary acts except those done in bad faith or with malice."  *State ex rel. Twiehaus v. Adolf*, 706 S.W.2d 443, 446 (Mo. 1986).

Bad faith or malice means "an actual intent to cause injury," or "conduct which is so reckless or wantonly and willfully in disregard of one's rights that a trier of fact could infer from such conduct bad faith or any improper or wrongful motive." *Id.* at 447.  The parties correctly acknowledge that the official acts in this case are discretionary. *See Wealot*, 865 F.3d at 1129 ("The use of force is a discretionary duty.").  Therefore, the remaining named Defendant officers are entitled to official immunity on Plaintiff's claims for negligent infliction of emotional distress (Count III) and battery (Count V) unless Plaintiff can show they acted in bad faith or with malice.

Viewed in the light most favorable to the Plaintiff, the evidence shows that the Defendant officers shoved Plaintiff to the ground and then kicked her once she had fallen. As discussed above, a reasonable jury could interpret the evidence to conclude that each of the Defendants personally participated in the use of excessive force against Plaintiff.

A reasonable jury could also conclude from this evidence that the officers engaged in conduct "so reckless or wantonly and willfully in disregard of [Plaintiff's] rights" that it permits an inference of bad faith.  *Wealot*, 865 F.3d at 1129.  Thus, these officers are not entitled to official immunity on Counts III or V, and the Court will deny their motion for summary judgment on those Counts. [7]

## IV.   Claims Against The City

The Court next addresses the claims against the City for municipal liability under federal law (Count II), and for negligent infliction of emotional distress (Count III) and battery (Count V) under state law.  With respect to the federal claim in Count II, the Court concludes that the City is entitled to summary judgment because Plaintiff's evidence fails to create a genuine dispute of material fact as to the City's liability under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).  With respect to the state-law claims against the City in Counts III and V, the Court will decline to exercise supplemental jurisdiction and will dismiss those claims without prejudice and without reaching Defendants' summary judgment arguments.

### A.  Municipal Liability under § 1983 (Count II)

"A municipality or other local government may be liable under [§ 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a

---

[7]      In their reply brief, Defendants also argue that Plaintiff's negligent infliction of emotional distress claim fails because it is duplicative of Plaintiff's battery claim.  *See* ECF No. 88 at 9.  The Court does not consider this argument as it was raised for the first time in a reply brief.  *See Green v. Missouri*, 734 F. Supp. 2d 814, 848 (E.D. Mo. 2010) ("As a general rule, courts will not consider arguments raised for the first time in a reply.").

person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citing *Monell*, 436 U.S. at 692). For a municipality to be liable under § 1983, the plaintiff must establish that some "action pursuant to official municipal policy" caused their injury. *Monell*, 436 U.S. at 691. This causal requirement demands that the municipality only be liable where the official policy is "the moving force of the constitutional violation . . . ." *Id.* at 694. "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61.

### 1. Failure to Train and Supervise

Plaintiff maintains that the City is liable under § 1983 for its failure to train and supervise its officers.[8] To overcome the city's motion for summary judgment, Plaintiff must demonstrate a genuine dispute of material fact as to whether "(1) [the City's] officer-training practices were inadequate; (2) [the City] was deliberately indifferent to the rights of others in adopting these training practices, and (3) [the City's] alleged training deficiencies caused [Plaintiff's] constitutional deprivation." *Ulrich v. Poe County*, 715 F.3d 1054, 1061 (8th Cir. 2013). Deliberate indifference requires "that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 410 (1997).

---

[8]     Although the parties discuss the failure to train and failure to supervise claims separately, both claims are governed by a similar standard. *See Robinette v. Jones*, 476 F.3d 585, 591 (8th Cir.2007).

Plaintiff relies on evidence of the City's failure to comply with the *Templeton* settlement's restrictions on the use of chemical agents and failure to train officers with respect to the settlement's terms.  However, the settlement terms on which Plaintiff relies expressly do not apply when "persons at the scene present an imminent threat of bodily harm to persons or damage to property, and when law enforcement officials must defend themselves or other persons or property against such imminent threat."  *See* ECF No. 75-6, Pl.'s Ex. 6, *Templeton* Settlement Agreement).

The undisputed facts demonstrate that persons present at the scene here were throwing water bottles and pieces of concrete at officers, presenting an imminent threat of bodily harm.  Therefore, the *Templeton* settlement did not apply in the circumstance of this case, and any failure with respect to training on the settlement could not have caused Plaintiff's injuries.[9]  *See Laney v. City of St. Louis, Missouri*, No. 4:18 CV 1575 CDP, 2021 WL 4439252, at *9 (E.D. Mo. Sept. 28, 2021) ("[R]egardless of the training, supervision, and disciplinary practices of the SLMPD or the City, [the defendant officer] did not violate the terms of the *Templeton* agreement in the circumstances of this case and thus his conduct did not give rise to the constitutional deprivation [plaintiff] alleges.").[10]

---

[9]   Moreover, the *Templeton* settlement applies only to the use of chemical agents. Plaintiff's injuries allegedly result from more than just pepper spray, and the *Templeton* settlement does not address the other types of force at issue here.

[10]   Nor does the other evidence relied upon by Plaintiff, such as officers' failure to document the use of force against Plaintiff in this case or the largely immaterial testimony of retired Sergeant Heather Taylor, create a genuine issue of material fact with respect to the City's failure to investigate or supervise misconduct.  *See Pineda v.*

## 2. Custom of Permitting the Use of Excessive Force

Plaintiff further asserts that the City is liable under § 1983 for maintaining a custom which permits officers to use excessive force.  Where a *Monell* claim depends upon the existence of a custom, "liability may be established through proof that the alleged misconduct was so pervasive among the non-policy making employees of the municipality as to constitute a 'custom or usage' with the force of law." *McGautha v. Jackson Cnty., Mo., Collections Dep't*, 36 F.3d 53, 56 (8th Cir.1994) (citation omitted). A custom or usage which is sufficient to constitute official policy is demonstrated by:

> (1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
>
> (2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
>
> (3) Th[e] [plaintiff's] injur[y] by acts pursuant to the governmental entity's custom, i.e., [proof] that the custom was the moving force behind the constitutional violation.

*Jane Doe A By & Through Jane Doe B v. Special Sch. Dist. of St. Louis Cty.*, 901 F.2d 642, 646 (8th Cir. 1990).  Multiple incidents of similar police misconduct may show evidence of a custom "if some evidence indicates that the incidents occurred over a course of time sufficiently long enough to permit notice of, and then deliberate indifference to or tacit authorization of, the conduct by policymaking officials." *Johnson v. Douglas County Medical Dept.*, 725 F.3d 825, 829 (8th Cir. 2013).

---

*Hamilton Cty., Ohio*, 977 F.3d 483, 495 (6th Cir. 2020) ("[A] claim based on inadequate investigation requires not only an inadequate investigation in this instance, but also a clear and persistent pattern of violations in earlier instances.") (citation omitted).

Plaintiff's single reference to the *Ahmad* transcript regarding prior incidents in which SLMPD officers used pepper spray without warning on protestors fails to constitute reliable evidence of a City custom of permitting the use of excessive force that caused Plaintiff's injuries.[11]   The excerpts of witness testimony in the transcript, while concerning, only briefly address the 2015 and 2017 incidents and do not provide the details necessary to evaluate their similarity to the current one, which, as noted above, is not limited to SLMPD's the use of pepper spray.  *See Thiel v. Korte*, 954 F.3d 1125, 1129 (8th Cir. 2020) ("Though Thiel alludes to prior complaints against Baker and Minor, he fails to provide the details necessary for us to determine whether these complaints were sufficiently numerous, or involved conduct sufficiently similar to what is alleged here, to make out the existence of an actionable custom."); *see also Mettler v. Whitledge,* 165 F.3d 1197, 1205 (8th Cir.1999) (requiring "detailed and compelling" evidence of a custom).  Nor are the excerpts sufficient to evaluate whether the prior complaints of excessive force had merit.  *See Rogers v. City of Little Rock*, 152 F.3d 790, 799 (8th Cir. 1998) (requiring a showing that prior complaints had merit in order to prove a custom).

Moreover, according to Plaintiff's own evidence, the City did not simply ignore the alleged misconduct but entered into a settlement agreement (the *Templeton*

---

[11]    Plaintiff also cites the other lawsuits arising out of the *Stockley* protests as evidence of a City custom.  But these lawsuits relate to incidents that occurred on the same day or weekend as the incident in this case.  As such, they could not give the City sufficient notice.  *See Burbridge v. City of St. Louis, Missouri*, 430 F. Supp. 3d 595, 620 (E.D. Mo. 2019), *aff'd*, 2 F.4th 774 (8th Cir. 2021) (finding that other incidents during the weekend of the *Stockley* protests could not evidence a custom).

settlement) specifically addressing the prior alleged misuse of chemical agents in the context of protests.  Finally, for the reasons stated above, any failure with respect to implementing the *Templeton* settlement was not the "moving force" behind the constitutional violation here.  For all of these reasons, the Court will grant summary judgment in favor of the City on Count II.

### B.  Sovereign Immunity on State-Law Claims (Counts III and V)

"Sovereign immunity is the privilege of the sovereign not to be sued without its consent." *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253 (2011). "[I]n the absence of an express statutory exception to sovereign immunity, or a recognized common law exception . . . sovereign immunity is the rule and applies to all suits against public entities." *Metro. St. Louis Sewer Dist. v. City of Bellefontaine Neighbors*, 476 S.W.3d 913, 921–22 (Mo. 2016).  "Courts 'give effect' to a state's waiver of sovereign immunity 'only where stated by the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction.'" *Church v. Missouri*, 913 F.3d 736, 743 (8th Cir. 2019) (quoting *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 305 (1990)).  As the Supreme Court of Missouri has emphasized, "[s]overeign immunity is the rule, not the exception." *Bellefontaine*, 476 S.W.3d at 914.

Missouri law provides that the state and its political subdivisions may waive sovereign immunity through the "purchase [of] liability insurance for tort claims."  Mo. Rev. Stat. § 537.610.1.  Sovereign immunity is waived in such circumstances "only to the maximum amount of and only for the purposes covered by such policy of insurance . . .

28

and for such purposes provided in any self-insurance plan duly adopted by the governing body of any political subdivision of the state."  Mo. Rev. Stat. § 537.610.1.   Plaintiff argues that the city has waived sovereign immunity under § 537.610 through the creation of the PFPC, which she alleges functions like a self-insurance program for the City.

The question of whether the City has waived sovereign immunity through its relationship with PFPC is one of first impression under Missouri law.  The Missouri Court of Appeals briefly addressed this issue in only one case, in a very recent decision that was grounded in the particular evidence presented.  *See Hendrix v. City of St. Louis*, 636 S.W.3d 889, 900–01 (Mo. Ct. App. 2021) (affirming circuit court's grant of summary judgment to the City on the grounds that the City had not waived sovereign immunity on plaintiff's negligent supervision and training claims).  But the issue has never been addressed by the Supreme Court of Missouri.

Federal courts are hesitant to exercise supplemental jurisdiction over novel, complex, and important issues of state law such as this one, on which the state appellate courts have provided little or no guidance.  *See* 28 U.S.C. § 1367(c)(1); *Fielder v. Credit Acceptance Corp.*, 188 F.3d 1031, 1038 (8th Cir. 1999) ("[N]ovel, complex, and important issues of state law on which the [state] appellate courts have given us little or no prior guidance . . . are precisely the types of issues as to which federal courts should hesitate to exercise § 1367 supplemental jurisdiction.").  The Court will thus decline to exercise supplemental jurisdiction over Plaintiff's state-law claims against the City in Counts III and V, and the Court will dismiss those claims without prejudice.  *See Laney*, 2021 WL 4439252, at *12; *Franks v. City of St. Louis*, No. 4:19 CV 2663 RWS, 2022

WL 1062035, at *11 (E.D. Mo. Apr. 8, 2022) (both holding the same with respect to a similar sovereign immunity argument).

## V.   **Remaining John Doe Defendants**

As noted above, this case has been pending for nearly three years, the Court has granted Plaintiff's requests for assistance in identifying the Doe Defendants, discovery is now complete, and the case is ready for trial.  "Fictitious parties must eventually be dismissed, if discovery yields no identities."  *Burbridge*, 430 F. Supp. 3d at 609 (citing *Kemper Ins. Companies, Inc. v. Fed. Exp. Corp.*, 115 F. Supp. 2d 116, 125 (D. Mass. 2000)).  Thus, the Court will require Plaintiff to show cause in writing why the Doe Defendants should not be dismissed.

## CONCLUSION

For the reasons set forth above,

**IT IS HEREBY ORDERED** that Defendants' motion for summary judgment is **GRANTED in part and DENIED in part**.  ECF No. 63.  The motion is **GRANTED** as to Counts I and II; the motion is otherwise **DENIED**.

**IT IS FURTHER ORDERED** that Court declines to exercise supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's claims against the City of St. Louis, Missouri in Counts III and V; those claims are **DISMISSED without prejudice** to the extent asserted against the City.

**IT IS FURTHER ORDERED** that Plaintiff shall, no later than **7 days** from the date of this Memorandum and Order, show cause in writing why the Doe Defendants

should not be dismissed.  Failure to comply with this Order will result in the dismissal of the Doe Defendants.

**IT IS FURTHER ORDERED** that the parties shall meet and confer with respect to a trial setting and, no later than **14 days** from the date of this Memorandum and Order, file a joint notice advising the Court of their proposed schedule for trial or otherwise advising the Court as to the status of the case.


_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 22nd day of April, 2022.